Jack RINER, Petitioner-Appellant,

v.

Norman G. OWENS, Superintendent, Indiana State Reformatory, Respondent-Appellee.

No. 83–1627.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 4, 1984.

Decided June 14, 1985.

Coffey, Circuit Judge, filed dissenting opinion.

Howard B. Eisenberg, So. Ill. Univ. Associate Professor of Law, Carbondale, Ill., for petitioner-appellant.

David L. Steiner, Deputy Atty. Gen., Indianapolis, Ind., for respondent-appellee.

Before CUDAHY, COFFEY and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Petitioner Jack Riner appeals from the district court's denial of his petition for a writ of habeas corpus. Riner challenges his conviction for first degree murder on the ground that he was denied the right to confront and cross-examine witnesses against him. The state of Indiana contends that he waived his right to raise the confrontation issue on appeal as a result of his failure to raise the issue at trial or on direct appeal in the state courts. For the reasons set forth below, we reverse the denial of the writ of habeas corpus.

### I.

The petitioner's conviction for first degree murder and sentence of life imprisonment arose from the events that transpired in the early morning hours of August 10, 1970, during the course of a burglary at Gibson's Trading Post near Belleville, Indiana. On that morning, Edward Gibson and his brother Harold Gibson, the co-owners of the trading post, drove to their store upon hearing an alarm in their homes, which was connected to the store's burglar alarm. The brothers positioned themselves at opposite ends of the store. As Harold started walking toward the store, he was shot in the leg. He testified that he proceeded to shoot at a fleeing figure going over a fence. When Harold went to the front of the store, he found his brother Edward holding a gun and yelling that he had also been shot. Upon seeing a man or boy running across a neighboring yard, Harold fired a few shots at the person. Harold saw a figure running across the road, got back into his car, drove across the road, and caught another glimpse of the

man running behind a house. Harold was unable, however, to identify the persons that he had seen that morning. Edward later died as a result of the shooting.

Petitioner Jack Riner, a fifteen-year-old, his older brother Ronald, and their uncle Wayne Evans were charged with first degree murder as a result of the killing, which occurred during the course of a felony. The charges against Ronald Riner were subsequently dismissed. The petitioner and Evans were represented by the same attorney at their joint trial. Ronald testified as a state's witness at the trial, relating his version of the events on the morning of August 10, 1970, and recounting a conversation that he had had with Evans during their confinement in jail awaiting trial.

At the conclusion of the jury trial during which neither Evans nor the petitioner testified, both the petitioner and his uncle were convicted and sentenced to life imprisonment. The Indiana Supreme Court affirmed the petitioner's conviction on direct appeal in *Riner v. State*, 258 Ind. 428, 281 N.E.2d 815 (1972). The petitioner was represented on this appeal by the same attorney who had represented him and his uncle at trial. On March 29, 1973, the petitioner filed his first petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1982) in the United States District Court for the Northern District of Indiana. This petition was denied on April 3, 1974. On March 1, 1976, the petitioner filed a petition for post-conviction relief in state court, raising for the first time his claim that he had been denied the right to confront and cross-examine witnesses against him. His petition was denied on September 24, 1976. The Indiana Supreme Court affirmed the denial of post-conviction relief in *Riner v. State*, 271 Ind. 578, 394 N.E.2d 140 (1979). On February 20, 1982, the petitioner filed his second petition for a writ of habeas corpus, in the United States District Court for the Southern District of Indiana, but that petition was dismissed without prejudice for want of jurisdiction and for failure to exhaust state remedies.

On April 15, 1982, the petitioner filed *pro se* the present petition for a writ of habeas corpus in the United States District Court for the Southern District of Indiana. In this petition, the petitioner alleges that: (1) he was denied his right to confront witnesses in state court, (2) the confrontation issue was not raised at trial or on direct appeal because the petitioner's counsel had a conflict of interest due to his dual representation of the petitioner and Evans, and (3) the state waived its waiver defense by responding to the merits of the petitioner's claim in the state post-conviction proceeding. The district court denied the petitioner's request for relief on March 3, 1983. The district court held that while the petitioner had exhausted his state court remedies, he had failed to show the necessary cause and prejudice to overcome waiver of the confrontation claim by his failure to raise it at trial or on direct appeal.

On appeal, the petitioner asserts that his right to confront and cross-examine witnesses was denied in Indiana state court and that he has not waived his right to address the confrontation issue on appeal.

II.

**A. Waiver of Right to Address Confrontation Issue on Appeal**

According to 28 U.S.C. § 2254(a), a state prisoner is entitled to habeas corpus relief in a federal court only if he is being held "in custody in violation of the Constitution or laws or treaties of the United States." *Engle v. Isaac*, 456 U.S. 107, 119, 102 S.Ct. 1558, 1567, 71 L.Ed.2d 783 (1982). Before determining whether a state prisoner's rights have been violated, however, a court must decide whether the prisoner has waived his claim for federal habeas corpus relief by failing to comply with such state procedural rules as those requiring a defendant to object at trial or to raise an issue on direct appeal. *Id.* at 126 n. 28, 102 S.Ct. at n. 28; *Williams v. Duckworth*, 724 F.2d 1439, 1442 (7th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 143, 83 L.Ed.2d 82

(1984).[1] The Supreme Court has observed that a federal court's decision whether to examine a state prisoner's constitutional claims when the prisoner has failed to abide by applicable state procedural rules implicates two types of concerns: (1) Congress's interest in providing a federal forum for the vindication of state prisoners' constitutional rights, and (2) the state's interest in the integrity of its procedural rules and in the finality of its judgments. *Reed v. Ross,* —— U.S. ——, 104 S.Ct. 2901, 2907, 82 L.Ed.2d 1 (1984). The courts have noted that principles of comity require a state prisoner to present his claims to the appropriate state tribunal before seeking relief in federal court, thereby giving the state court the first opportunity to correct a constitutional violation. *See, e.g., United States ex rel. Spurlark v. Wolff,* 699 F.2d 354, 356 (7th Cir.1983).

Although recognizing the state's interest in the integrity of its procedural rules, the Supreme Court has consistently held that federal courts have the power under 28 U.S.C. § 2254 to look beyond a state procedural forfeiture in order to examine a state prisoner's claim that his constitutional rights have been violated. *Reed v. Ross,* 104 S.Ct. at 2907. The Court has held that when a procedural default by a state prisoner bars litigation of a constitutional claim in the state courts, the prisoner may obtain federal habeas corpus relief by showing cause for and actual prejudice from the default. *Engle v. Isaac,* 456 U.S. at 129, 102 S.Ct. at 1572; *Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977). In formulating the cause and prejudice standard, the Court has declined to give the term "cause" precise content because of the numerous reasons for an attorney's failure to comply with a procedural rule and the limitless array of contexts in which a procedural default could occur. *Reed v. Ross,* 104 S.Ct. at 2909. The Court has noted that the terms "cause" and "actual prejudice" are not rigid concepts, but rather take their meaning from principles of comity and finality. *Engle v. Isaac,* 456 U.S. at 135, 102 S.Ct. at 1575. Thus, these terms may yield in cases in which it is necessary for a court to correct a fundamentally unjust incarceration. *Id.*

In the present case, the respondent argues that the petitioner Jack Riner waived his Sixth Amendment confrontation claim by failing to make a contemporaneous objection during trial and by failing to raise the confrontation issue on direct appeal. The petitioner did not raise the confrontation issue until he filed his petition for post-conviction relief. In examining his pe-

---

1. A second procedural obstacle that might bar a state prisoner's habeas corpus petition in the federal courts is the argument that a prisoner has failed to exhaust state remedies. *Engle v. Isaac,* 456 U.S. 107, 126 n. 28, 102 S.Ct. 1571 n. 26, 71 L.Ed.2d 783 (1982); *Perry v. Fairman,* 702 F.2d 119, 120 (7th Cir.1983). According to the exhaustion requirement of 28 U.S.C. § 2254(b), a district court cannot grant a writ of habeas corpus unless the petitioner has "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b) (1982); *Gray v. Greer,* 707 F.2d 965, 967 (7th Cir.1983). In order to meet the exhaustion requirement, a petitioner must give the state courts the initial opportunity to address the particular federal constitutional claims. *Gray v. Greer,* 707 F.2d at 967. This requirement serves to minimize any potential conflicts between the state and federal courts. *Id.* The statute, however, does provide an exception to the exhaustion requirement in cases where "there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner." 28 U.S.C. § 2254(b) (1982); *Gray v. Greer,* 707 F.2d at 967. Furthermore, the exhaustion requirement refers only to state remedies still available to the petitioner at the time that he files his federal habeas corpus petition. *Engle v. Isaac,* 456 U.S. at 126 n. 28, 102 S.Ct. at 1571 n. 28; *Gray v. Greer,* 707 F.2d at 967. Since the Indiana Supreme Court denied Jack Riner post-conviction relief because he had waived his confrontation claim for purposes of the Indiana post-conviction process by not raising it at trial or on direct appeal, we affirm the district court's conclusion that he has exhausted his state remedies. *See Williams v. Duckworth,* 724 F.2d 1439, 1441 (7th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 143, 83 L.Ed.2d 82 (1984) (since Indiana Supreme Court treats issues not raised on direct appeal as waived for purposes of Indiana post-conviction remedy, a petitioner need not raise those issues in a post-conviction petition or on an appeal from the denial of a post-conviction petition in order to exhaust his state remedies).

tition, the state circuit court held that the petitioner had waived the confrontation issue by not raising it on direct appeal. The circuit court also concluded that if the confrontation issue had been raised on direct appeal, the Indiana Supreme Court would likely have granted the petitioner a new trial based on a violation of the petitioner's Sixth Amendment right to confront witnesses under *United States v. Bruton,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Upon petitioner's appeal of the circuit court's denial of post-conviction relief, the Indiana Supreme Court concluded that the petitioner had waived his right to raise the confrontation issue in his petition for post-conviction relief under the Indiana post-conviction relief statute [2] by not raising the issue at the time of the original trial or on direct appeal. *Riner v. State,* 271 Ind. 578, 581–82, 394 N.E.2d 140, 143–44 (1979). Since the petitioner has therefore waived his right to raise the confrontation issue in the Indiana courts by failing to raise the issue at trial or on direct appeal, we must determine whether the petitioner has shown cause for and actual prejudice from the default, thereby permitting us to overcome the waiver argument and to examine the petitioner's claim on the merits.

The petitioner claims that the confrontation issue was not raised at trial or on direct appeal because the same attorney represented him at both levels. We hold that dual representation of co-defendants at trial and representation of one or more of these defendants by that same attorney on direct appeal can meet the cause element of the cause and prejudice standard under certain circumstances. In a case where an individual is represented by the same counsel at both the trial and appellate levels, there exists the possibility that the attorney might be inhibited from raising on appeal issues stemming from the defendants' conflicting defenses because to do so might cast doubt on the effectiveness or propriety of the attorney's dual representation at trial. In several cases where a petitioner has been represented by different attorneys at trial and on appeal and where we have denied habeas corpus relief, we have hinted that the outcome of the case may have been different if the same attorney had represented the petitioner at both the trial and on direct appeal since the same attorney might be reluctant to raise issues on appeal that might suggest his ineffectiveness at trial. *United States ex rel. Devine v. DeRobertis,* 754 F.2d 764, 766–68 (7th Cir.1985); *Dently v. Lane,* 712 F.2d 1172, 1175–78 (7th Cir.1983); *United States ex rel. Williams v. Franzen,* 687 F.2d 944, 950 n. 11 (7th Cir.1982). Since it would be most difficult if not professionally awkward to require a lawyer to argue on appeal his own ineffectiveness in not raising at trial issues relating to his dual representation, such as the confrontation question presented here, we conclude that identity of trial and appellate counsel can constitute sufficient cause to meet the first element of the cause and prejudice standard.

In addition to showing cause for his failure to comply with state procedural rules, the petitioner must also show actual prejudice suffered as a result of his failure to raise an issue at trial or on direct appeal. *Engle v. Isaac,* 456 U.S. at 129, 102 S.Ct. at 1572; *Wainwright v. Sykes,* 433 U.S. at 87, 97 S.Ct. at 2506. Although noting that it would not precisely define the terms "cause" and "prejudice," the Court in *Wainwright v. Sykes* held that the evidence presented at trial of the petitioner's guilt in that case was so substantial as to

---

**2.** The Indiana Post-Conviction Relief Remedy Rules provide:

All grounds for relief available to a petitioner under this rule must be raised in his original petition. Any ground finally adjudicated on the merits or not so raised and knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence, or in any other proceeding the petitioner has taken to secure relief, may not be the basis for a subsequent petition, unless the court finds a ground for relief asserted which for sufficient reason was not asserted or was inadequately raised in the original petition. Ind.Code Ann., Court Rules, Post-Conviction Relief, Rule 1, § 8 (Burns 1984).

negate any possibility of actual prejudice resulting to the petitioner from the admission of his inculpatory statement. *Wainwright v. Sykes*, 433 U.S. at 87, 91, 97 S.Ct. at 2506, 2508. In the present case, we must determine whether the petitioner was prejudiced as a result of his attorney's failure to raise the confrontation issue at trial or on direct appeal, when the effect of that failure was the admission of Ronald's testimony as to his conversation with Evans in jail.

Ronald Riner testified as a prosecution witness at the joint trial of his brother and uncle. Based on his personal knowledge, Ronald related that he had been driving around with his uncle and brother in Evans's car in the early morning hours of August 10, 1970. Ronald stated that he had been sleeping in the back seat when the car stopped and Evans got out and walked back to the trunk. Ronald related that Evans removed a plastic bag from the trunk that had an object resembling the butt of a rifle sticking out of it and proceeded to ask Jack if he would go with him. Ronald stated that he lay back down in the back seat until he heard some shooting and saw several cars pulling up to a building. Ronald stated that he got out of the car and saw someone, whom he believed to be Evans, running first toward the car and then toward the town of Plainfield. Ronald testified that he became frightened and ran into a field.

In addition to his testimony based on his personal knowledge, Ronald testified to a conversation that he had had with his uncle while in jail awaiting trial. Ronald testified that his uncle had told him that he had instructed Jack to be a lookout on the morning of August 10 while Evans tried to force open the door of the trading post. Ronald also testified that his uncle said that he had been shot at by someone and had returned the fire. Evans also told Ronald that as he was running east, he was confronted by another man who fired at him, and that Evans shot this man. Before Ronald testified as to that conversation with Evans, the defendants' attorney objected as to Jack Riner on unspecified grounds. The state trial court sustained the objection as to Jack Riner and admitted Ronald's subsequent testimony only as to Evans.[3]

3. The following excerpt from the trial transcript relates the questions that the state prosecutor asked Ronald Riner concerning his conversation with Evans in the county jail:

Q: After you were in the Hendricks County Jail, did you at any time, have any conversation with a Mr. Wayne Evans?
A: Yes, sir.
Q: Approximately when was this?
A: Approximately 10 days to 2 weeks after this crime happened.
Q: And where did that conversation take place?
A: In one of the cells in Hendricks County Jail.
Q: And who was present?
A: There was several men in the cell, Wayne and I went off to one of the back cells.
Q: And what did he say to you, and what did you say to him?
Defense Counsel: Objection, as far as Jack Riner is concerned, Your Honor.
Court: Objection sustained as far as Jack Riner. Admitted only as to Wayne Evans. You may answer now.
A: I ask for an explanation as to what happened. At which time I was told.
Q: What did he tell you?
A: He told me that, him and Jack, was over to the building, he ask Jack if he would watch for him, that they were going to try and get into the building. He tried to force open a door, and continued doing so until he heard a car in front of the building. He went to look and there was someone running toward the building and Jack holl[e]red from the other side that, there was somebody over there. And they said that was when the shooting started.
Q: What did he specifically tell you, Ronald that happened?
A: He just said he was shot at, he shot back he fired several rounds from the ground on the west end of the building. In order to stop the man, then he ran east, from the back of the building. At which time he was confronted on the east end of the building by another man, he began firing at him, he ran across the street and fell, the man started running toward him, fired several rounds at him.
Q: You say, he? You mean Wayne Evans fired?
A: No, sir. The other man fired.
 *   *   *   *   *   *
A: The man that I understand that got killed was doing the firing at the time he fell. He fired several rounds at him, he said. He said he had no alternative, when he got up but to shoot the man, rather than the man to shoot

We hold that the admission of Ronald's testimony as to his conversation with Evans resulted in actual prejudice to the petitioner. The petitioner was prejudiced because the admission of this testimony was the only evidence before the jury of the petitioner's involvement in aiding and abetting the burglary and murder. For example, Evans stated to Ronald that Jack had served as a lookout for Evans, thereby providing support for the charge that Jack had facilitated the burglary and murder. In contrast to this damaging testimony, Ronald's personal testimony as to the events transpiring on August 10, 1970, merely revealed that Jack had been asked by his uncle to go with him, not that Jack had actively aided and abetted his uncle in the ensuing crimes. There was no direct evidence presented at trial that Jack was even aware of what his uncle was planning to do. Even Harold Gibson's testimony that he had seen two persons fleeing the scene following the shooting did not establish that one of those persons was Jack. Since Ronald himself testified that he had become frightened when the shooting began and had fled the scene, the fleeing persons that Harold Gibson had seen might easily have been Ronald and his uncle.

Furthermore, the objection by defense counsel on unspecified grounds to the admission of Ronald's testimony regarding his conversation with Evans was insufficient to reduce or eliminate the substantial prejudice that the petitioner suffered as a result of the admission of the testimony. As will be discussed below, the admission of this testimony was a clear *Bruton* violation. Thus, the judge's statement to the jury to disregard the testimony as far as Jack was concerned could not erase the extremely prejudicial impact that the statement might have had on the jury. In cases such as the present one where there is not substantial evidence apart from the excludable testimony to implicate a petitioner in a crime, the negative effect on the jury of the admission of the testimony and the

resultant prejudice suffered by a petitioner cannot be eradicated.

■ In sum, we hold that the petitioner has shown both the cause and actual prejudice elements necessary to overcome his waiver of the confrontation issue in the state courts.

### B. Violation of Right to Confront and Cross-Examine Witnesses under the Sixth Amendment

Since we have concluded that the petitioner has met the cause and actual prejudice standard, we will proceed to determine on the merits whether the petitioner has shown that his Sixth Amendment right to confront and cross-examine witnesses was violated. The petitioner argues that this right was violated when a statement made by a nontestifying co-defendant, with whom the petitioner was being jointly tried, was revealed to the jury.

In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that a defendant's conviction in a joint trial should be set aside when a co-defendant's confession inculpating the defendant is revealed through the testimony of a witness even though the trial court has instructed the jury to disregard the confession in determining the defendant's guilt or innocence. In *Bruton,* a postal inspector testified at the joint trial of two defendants that one of the defendants had confessed orally that he and his co-defendant had committed a robbery. *Id.* at 124, 88 S.Ct. at 1621. Although noting that the oral confession was legitimate evidence against the defendant who made it, the Court held that the introduction of the confession posed a substantial threat to the other defendant's Sixth Amendment right to confront witnesses against him, since the confessing defendant did not take the stand. *Id.* at 127–28, 137, 88 S.Ct. at 1623, 1628. The Court reasoned that an instruction by the trial court to disregard such a confession could not deflate the impact on the jury of such a powerfully incriminating

him. At which time he shot twice at him, the

man fell forward and he ran south on U.S. 39.

extrajudicial statement. *Id.* at 135–36, 88 S.Ct. at 1627–28. The Court concluded that the unreliability of such a confession would be intolerably compounded if the alleged accomplice did not testify and thus become subject to cross-examination. *Id.* at 136, 88 S.Ct. at 1628.

■ In interpreting *Bruton,* we have held that the admission of a co-defendant's out-of-court confession violates a defendant petitioner's right of confrontation under the Sixth Amendment where the confession is vital to the government's proof of its case and directly implicates the defendant. *United States v. Key,* 725 F.2d 1123, 1125–27 (1984). In the present case, we hold that Jack Riner's right to confront and cross-examine witnesses against him was violated by the admission of Ronald's testimony as to his conversation with Evans even though the judge sustained defense counsel's objection to the testimony as to Jack. As in *Bruton,* the impact of the admission of the incriminating testimony on the jury could not be deflated by the trial court's instruction to disregard the testimony as to Jack, especially when the testimony was the only evidence clearly implicating Jack as an aider and abettor of his uncle. Ronald's testimony as to Evans's statement was vital to the government's case and directly implicated Jack in the murder. In such a case, the admission of the prejudicial testimony is not harmless. *Cf. Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) (any violation of *Bruton* is harmless error where there is overwhelming evidence of the petitioner's guilt and the prejudicial impact of the co-defendants' statements is relatively insignificant). We hold that the admission of the testimony directly violated the petitioner's right to confront and cross-examine witnesses against him guaranteed by the Sixth Amendment.

In conclusion, the district court's denial of Jack Riner's petition for a writ of habeas corpus is reversed.

COFFEY, Circuit Judge, dissenting.

The petitioner, Jack Riner, claims that his Sixth Amendment right to confront and cross-examine witnesses against him was violated when the prosecution elicited testimony of a jail cell conversation between Ronald Riner, the petitioner's brother, and Wayne Evans, the petitioner's uncle, implicating Jack Riner in the murder of Edward Gibson. Riner waived his Sixth Amendment claim by failing to raise the issue either at trial or on direct appeal to the Indiana Supreme Court. Nevertheless, the majority holds that Riner has demonstrated sufficient cause and prejudice to overcome this waiver and prevail on the merits of his Sixth Amendment claim. I dissent. The record clearly reveals that the State of Indiana introduced more than ample evidence at trial, independent of the jail cell conversation, to establish the petitioner's participation in the murder of Edward Gibson, beyond a reasonable doubt. Accordingly, I would hold that Jack Riner has failed to demonstrate the prejudice necessary to overcome the waiver of his Sixth Amendment claim.

I

On September 4, 1970, the Grand Jury of Hendricks County, Indiana, indicted the petitioner, Jack Riner, and his uncle, Wayne Evans, for first degree murder in connection with the shooting of Edward Gibson during an attempted burglary of Gibson's Trading Post in Belleville, Indiana. In December 1970, following a joint trial where Jack Riner and his uncle were represented by the same defense counsel, the jury returned a verdict of guilty against each defendant. At trial, Harold Gibson, the victim's brother; Ronald Riner, the petitioner's brother; and Virgil Ramp, the Hendricks County Deputy Sheriff who arrested Jack Riner, presented the testimony relevant to Jack Riner's conviction.

Harold Gibson testified that on August 10, 1970, at approximately 3:00 a.m., the burglary alarm sounded at Gibson's Trading Post, a general store in Belleville, Indiana, that was co-owned and operated by Harold and his brother Edward Gibson.

Harold arose from bed, instructed his wife to call the Indiana State Police, and proceeded immediately to the store where he met his brother. As Harold began to circle the outside perimeter of the store, he was shot in the leg and fell to the ground. When he looked up, he peered into the distance and saw "somebody trying to go over the fence in the backyard." According to Harold, he attempted to pursue the burglary suspect and:

"when I got almost to the east end of the building, my brother was down on one knee, holding his gun, and he hollowed [sic] that, he had been hit. I stopped by a telephone booth and telephone pole there, on the east end and some man or boy was running across the neighbor's yard. And I fired a few shots at him. I went over to my brother and asked him if he was alright, he said, just burned."

Harold further testified that once he discovered that his brother had been shot, he:

"noticed a man or boy running across [Highway] # 40, going south, and my brother seen him at the same time.

\* \* \* \* \* \*

When I seen him run across # 40, I got up and got in my car, put a new clip in my gun, drove across # 40, got just a glimpse of a man running behind a house or beside the house."

The Indiana State Police arrived a short time later and Harold informed them that "there was something in the weed patch running, that was carrying a gun, or in that line." Harold returned to his store and "tried to go into the building, which the doors was 'jimmied' and we couldn't get in." The law enforcement officers then placed the wounded Gibson brothers in an ambulance and transported them to a nearby hospital where Edward Gibson later died as a result of his gunshot wound.

Ronald Riner testified that on August 9, 1970, at approximately 10:00 p.m., he, his brother Jack Riner, and their uncle, Wayne Evans, were joyriding around Indianapolis, Indiana in Evans' 1963 Pontiac. Ronald, who was lying down in the back seat, asked Evans to return home because he was get-ting "sleepy." Ronald fell asleep and the next thing he remembers Evans stopped the automobile, exited the driver's side, and proceeded to the trunk of the car. Evans retrieved a plastic bag from the trunk, and, according to Ronald, it "looked like the butt of a gun, sticking out of the bag ... it was a long gun...." Ronald further testified that Evans returned to the front of the vehicle and asked Jack Riner, "if he would go with him." Jack agreed and "got out of the car." According to Ronald, Evans and Jack Riner "went off west from the car" toward Gibson's Trading Post and he "laid back down in the car." The next thing Ronald remembers is that he:

"heard some shooting going on, several cars pulling up at a building off to my right. Some people hollering, shouting, then I jumped out of the car and looked back over the top of the car and I saw somebody that looked like Wayne running south on U.S. 39, coming towards the car and then he turned east and went toward Plainfield."

Ronald Riner became scared and fled to a nearby field where he remained hidden for approximately one hour before being arrested by two Marion County sheriffs. According to Riner, he informed the law enforcement officer "who was with me. And the last time I had saw [sic] them. And gave them a description." Ronald explained that "Jack Riner, my brother and Wayne Evans, my uncle" were the ones with him.

Deputy sheriff Ramp testified that on August 10, 1970, at approximately 8:00 a.m., he apprehended Jack Riner "about one-half mile east of Belleville on U.S. 40." According to deputy sheriff Ramp, Jack Riner's "trousers were all wet from the knee down and his clothes were all rumpled. That is how I come [sic] to stop him. The conditions [sic] of his clothes and stuff." The record also reveals that Wayne Evans was arrested on August 10, 1970, at approximately 10:30 p.m., on U.S. Highway 40, east of Belleville, Indiana.

Following the presentation of the foregoing testimony of Harold Gibson, Ronald

Riner, and deputy sheriff Ramp to the jury, the prosecution questioned Ronald Riner about a jail cell conversation he had with his uncle Wayne Evans, some two weeks after their arrest. The State's Attorney asked Ronald, "what did he say to you, and what did you say to him?" At that point, the defense counsel, who was representing both Jack Riner and Wayne Evans at trial, raised an "[o]bjection, as far as Jack Riner is concerned" because he was not a party to the conversation. The court sustained the objection and admitted the testimony "only as to Wayne Evans." Ronald Riner then testified that in the jail cell conversation:

"A. [Wayne Evans] told me that, him and Jack, was over to the building, he asked Jack if he would watch for him, that they were going to try and get into the building. He tried to force open a door, and continued doing so until he heard a car in front of the building. He went to look and there was someone running toward the building and Jack hollored [sic] from the other side that, there was somebody over there. And they said that was when the shooting started.

Q. What did he specifically tell you, Ronald that happened?

A. He just said he was shot at, he shot back he fired several rounds from the ground on the west end of the building. In order to stop the man, then he ran east, from the back of the building. At which time he was confronted on the east end of the building by another man, he began firing at him, he ran across the street and fell, the man started running toward him, fired several rounds at him.

Q. You say he? You mean Wayne Evans fired?

A. No, sir. The other man fired.
          *    *    *    *    *    *

A. The man that I understand that got killed was doing the firing at the time he fell. He fired several rounds at him, he said. He said he had no alternative, when he got up but to shoot the man, rather than the man to shoot him. At which time he shot twice at him, the man fell forward and he ran south on U.S. 39."

Ronald Riner further testified that in another jail cell conversation, Jack Riner and Wayne Evans approached him and stated that "they didn't think I should testify in this matter, that they felt like that was what it was leading to, was me, turning State's evidence. That they wouldn't like it, and didn't think it was fair." Based upon the totality of the evidence presented at trial, the jury found Jack Riner and Wayne Evans each guilty of the murder of Edward Gibson and the trial judge sentenced each defendant to life imprisonment.

Jack Riner filed a direct appeal of his conviction to the Indiana Supreme Court, alleging, *inter alia*, that he was improperly tried in the Morgan County Circuit Court because he was only sixteen years of age at the time of trial, that Ronald Riner's testimony was incompetent, and that the prosecutor engaged in prejudicial misconduct.[1] At no time did Jack Riner argue before the Indiana Supreme Court that he was denied his Sixth Amendment right to confront and cross-examine witnesses against him. On May 3, 1972, the Indiana Supreme Court affirmed Jack Riner's conviction for the first degree murder of Edward Gibson. *Riner v. State*, 258 Ind. 428, 281 N.E.2d 815 (1972) ("*Riner I*"). On March 29, 1973, Riner filed a petition for writ of habeas corpus in Federal court that was subsequently denied on May 3, 1974. On March 1, 1976, some five-and-one-quarter years after his conviction for the first degree murder of Edward Gibson, Riner filed a motion for post-conviction relief in the Morgan County Circuit Court, alleging

---

1. The record reveals that on October 2, 1970, a change of venue was granted in this case, transferring the first degree murder trial from the Circuit Court of Hendricks County, Indiana to the Circuit Court of Morgan County, Indiana.

for the first time that he had been denied his Sixth Amendment right to confront and cross-examine witnesses against him when Ronald Riner testified about Wayne Evans' jail cell conversation, implicating Jack Riner in the murder of Edward Gibson. The court denied post-conviction relief, finding that Riner had failed to raise the Sixth Amendment claim either at trial or on direct appeal and had thus waived the issue. The Indiana Supreme Court affirmed the denial of Riner's motion for post-conviction relief, ruling that:

"[t]he post-conviction relief process is not a substitute for direct appeal, but is a process for raising issues not known at the time of the original trial and appeal or for some reason not available to the defendant at that time. *Bradberry v. State*, (1977) 266 Ind. 530, 364 N.E.2d 1183, 1188. Additional review of [Ronald Riner's] testimony on other grounds is not available here in this post-conviction relief procedure and the court properly found against the appellant in that *this issue had been waived.*"

*Riner v. State*, 271 Ind. 578, 582, 394 N.E.2d 140, 144 (1979) (emphasis added) ("*Riner* II").

On April 15, 1982, Jack Riner filed his present habeas corpus petition in the United States District Court for the Southern District of Indiana, alleging that his Sixth Amendment right to confront and cross-examine witnesses against him was violated when Ronald Riner testified as to his jail cell conversation with Wayne Evans concerning Jack Riner's participation in the murder of Edward Gibson. The district court properly ruled, based upon the controlling case law, that Riner's Sixth Amendment claim was "waived by the failure of petitioner to raise it on direct appeal." The court reasoned that:

"[p]etitioner here fails to show how he was harmed and substantially prejudiced.

\*  \*  \*  \*  \*  \*

Evans did not implicate petitioner as the killer but merely as a lookout. Even without this testimony it is clear that Ronald Rider [sic] could place petitioner

at the scene of the murder, and had heard Wayne Evans ask for petitioner's assistance. Such evidence, in itself, is enough to establish petitioner as an accomplice and subject to criminal prosecution for felony murder."

The majority now reverses the district court's ruling and holds that Jack Riner has demonstrated sufficient cause and prejudice to overcome the waiver and prevail on the merits of his Sixth Amendment claim.

## II

The law is well-settled that "when a procedural default bars state litigation of a constitutional claim, a state prisoner may not obtain federal habeas relief absent a showing of cause and actual prejudice." *Engle v. Isaac*, 456 U.S. 107, 129, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982). *See also Sumner v. Mata*, 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981); *Wainwright v. Sykes*, 433 U.S. 72, 86–87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977). In the present case, the Indiana Supreme Court properly ruled in *Riner II* that Jack Riner's failure to raise his Sixth Amendment claim either at trial or on direct appeal constitutes the procedural default of waiver, barring subsequent litigation of the claim under Indiana law. 271 Ind. at 582, 394 N.E.2d at 144. Thus, in order for Riner to obtain federal habeas relief he must establish cause for and actual prejudice resulting from his failure to raise the Sixth Amendment claim at trial or on direct appeal. This "cause and prejudice" standard is a conjunctive test that requires Riner to establish both cause *and* prejudice if he is to overcome the procedural default of waiver; failure to establish either one of the elements results in a dismissal of his habeas corpus petition.

The district court found that:

"[p]etitioner here fails to show how he was harmed and substantially prejudiced.

\*  \*  \*  \*  \*  \*

Evans did not implicate petitioner as the killer but merely as a lookout. Even

without this testimony it is clear that Ronald Rider [sic] could place petitioner at the scene of the murder, and had heard Wayne Evans ask for petitioner's assistance. Such evidence, in itself, is enough to establish petitioner as an accomplice and subject to criminal prosecution for felony murder."

I agree with the district court judge that Jack Riner has failed to demonstrate that his failure to raise the Sixth Amendment claim either at trial or on direct appeal actually prejudiced his case. In view of this conclusion, I do not reach the issue of whether representation by the same attorney at a criminal trial and on direct appeal constitutes sufficient "cause" to overcome the procedural default of waiver. Moreover, I do not reach the merits of Riner's claim that the jail cell conversation violated the principles of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), depriving Riner of his Sixth Amendment right to confront and cross-examine witnesses against him.

The record reveals that Jack Riner was charged with and found guilty of the first degree murder of Edward Gibson. At the time of Riner's prosecution, Ind.Code Ann. § 10–3401 (Burns 1956) provided that "[w]hoever ... in the perpetration of or attempt to perpetrate a ... burglary ... kills any human being, is guilty of murder in the first degree...." Moreover, Ind. Code Ann. § 9–102 (Burns 1956) provided that "[e]very person who shall aid or abet in the commission of a felony ... may be charged by indictment, or affidavit, tried and convicted in the same manner as if he were a principal...." The majority asserts that "[t]he petitioner was prejudiced because the admission of [Wayne Evans' jail cell] testimony was the only evidence before the jury of the petitioner's involvement in aiding and abetting the burglary and murder." From my independent review of the record, I am convinced that the jury was presented with more than sufficient evidence, before introduction of the jail cell conversation, to find, beyond a reasonable doubt, that Jack Riner aided and

abetted in the burglary that resulted in Edward Gibson's death.

According to the evidence presented to the jury, Wayne Evans retrieved a gun from the trunk of his automobile and then approached Jack Riner, asking him "if he would go with him." Jack Riner agreed and "got out of the car." Evans and Jack Riner then "went off west from the car," toward Gibson's Trading Post. At approximately 3:00 a.m. the burglary alarm at Gibson's Trading Post sounded, causing Harold Gibson to rise from bed and proceed immediately to the store. Upon his arrival, Harold was shot in the leg, fell to the ground, and as he looked up he saw "somebody trying to go over the fence in the backyard." Harold hobbled toward his wounded brother and observed "some man or boy ... running across the neighbor's yard." Once he reached his brother, Harold "noticed a man or boy running across # 40 going south." The law enforcement officers arrived on the scene, apprehended Ronald Riner, and questioned him as to who else was involved in the crime. Ronald informed the officers that "Jack Riner, my brother and Wayne Evans, my uncle" were with him. At approximately 8:00 a.m., deputy sheriff Ramp arrested Jack Riner one-half mile east of Belleville, Indiana on U.S. Highway 40. Similarly, at approximately 10:30 a.m., the law enforcement officers arrested Wayne Evans, who was also traveling east on U.S. Highway 40.

The foregoing evidence establishes that after Wayne Evans retrieved a gun from the trunk of the car, he and Jack Riner left Ronald and proceeded toward Gibson's Trading Post, the scene of the attempted felony burglary and the murder of Edward Gibson. Evans' question to Jack Riner, "if he would go with him," clearly evidences Evans' intent that Jack aid and abet in the armed burglary. Indeed, the fact that Jack Riner freely agreed to accompany Evans evidences Riner's intent to assist in the burglary, as there is no other possible explanation for accompanying the armed Evans to Gibson's Trading Post. It is for this very reason that following the attempted

burglary and the murder of Edward Gibson, Ronald Riner informed the law enforcement officers, "Jack Riner, my brother and Wayne Evans, my uncle," were the ones involved in the crime.

Furthermore, a reasonable juror would have considered the fact that Jack Riner not only knowingly and willfully accompanied Wayne Evans to Gibson's Trading Post, but that he also fled the scene of the crime once the shooting began. Harold Gibson testified that as he began to search the perimeter of the store, he was immediately shot in the leg and when he peered into the distance, he observed "somebody trying to go over the fence in the backyard." When Harold hobbled toward his wounded brother, he again saw "some man or boy ... running across the neighbor's yard." Once he reached his brother on the other side of the building, he "noticed a man or boy running across # 40 going south...." Though Harold was unable to identify the person climbing the fence and running through the neighbor's yard or the person running south across U.S. Highway 40, due to the nighttime conditions existing at 3:00 a.m. in the morning, the law enforcement officers apprehended Jack Riner some five hours later, approximately one-half mile from the scene of the crime. Riner's physical appearance revealed that he had been "on the run" for some time. Riner's decision to flee from the scene of the crime when the shooting commenced and his attempt to evade law enforcement officers by running through the farmlands of rural Indiana is a further indication of his participation in the attempted burglary. In view of this evidence, I am convinced that a reasonable juror could find, beyond a reasonable doubt, that Jack Riner aided and abetted in the felony burglary that resulted in the murder of Edward Gibson. Accordingly, I would hold that Wayne Evans' jail cell conversation, simply confirming Riner's participation in the felony burglary, did not prejudice Jack Riner's case. As a result, Riner has failed to demonstrate the prejudice necessary to overcome the procedural default of waiver and the petition for writ of habeas corpus should be denied.