UNITED STATES of America, Appellee,

v.

Gus CURCIO, Appellant.

UNITED STATES of America, Appellee,

v.

James HAWLEY, Appellant.

Nos. 703, 704, Dockets 84–1261, 84–1263.

United States Court of Appeals,
Second Circuit.

Argued Jan. 22, 1985.

Decided April 5, 1985.

Andrew B. Bowman, Westport, Conn., for appellant Gus Curcio.

David S. Golub, Stamford, Conn. (Leora Herrmann, Silver, Golub and Sandak, Stamford, Conn., of counsel), for appellant James Hawley.

John H. Durham, New Haven, Conn., U.S. Dept. of Justice, (Alan H. Nevas, U.S. Atty., D. Conn., William A. Keefer, U.S. Dept. of Justice, New Haven, Conn., of counsel), for appellee.

Before VAN GRAAFEILAND, MESKILL and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Defendants appeal from a conviction for attempting to violate the Hobbs Act, 18 U.S.C. § 1951 (1982), after a jury trial before Judge Burns. We reject their various claims of error during the trial and affirm.

## BACKGROUND

The prosecution's case concerned events that occurred on June 2, 1982, at the Blue Ribbon Tavern in Bridgeport, Connecticut, an establishment owned by one William Kozakiewicz. Earlier that day, his brother-in-law had purchased a video game in New Jersey and had installed it in the Blue Ribbon. The Blue Ribbon already contained a pool table and pinball machine owned by Kozakiewicz and a juke box and another pinball machine rented from Hawley Enterprises. Hawley Enterprises was engaged primarily in the business of renting vending machines and was owned principally by the defendant Gus Curcio. The defendant Hawley and an employee of the Hawley firm, one Dahill D'Onofrio, were also part owners.

The government's proof showed that at approximately 10:45 p.m. on June 2, the two defendants, along with D'Onofrio and two others, double parked a Cadillac El Dorado near the Blue Ribbon. Hawley and one of the occupants of the car entered the bar. Although the defense disputes the sufficiency of the government's identification evidence, a reasonable jury could have concluded that the other person was the defendant Curcio. After entering, Hawley stood in the doorway, drew a .357 magnum revolver, and warned the patrons of the Blue Ribbon not to move. Curcio, who had a plastic bag over his hand, smashed the new video game with a sledge hammer he had brought with him. Leaving the hammer imbedded in the game, the defendants exited the bar and returned to the El Dorado.

While the defendants were running towards their car, a Bridgeport Police Department patrol car came down the street. The officers in the car saw two individuals running towards the double parked El Dorado and a crowd milling around in front of the bar. After a patron yelled that the two men running down the street had just smashed up the bar, the officers pursued the now moving El Dorado. Notwithstanding the pursuit by a police car with flashing lights, the El Dorado proceeded for three and one half blocks and ran one stop sign before pulling over. Curcio then got out of the car from the driver's seat and told the police officers that they could not arrest him because he was Gus Curcio. Unpersuaded, the police officers arrested him and his compatriots. A search of the car revealed a .357 magnum registered to Hawley, a .38 revolver registered to another occupant and Hawley employee, Kent Toresso, and a plastic bag. Both guns were loaded with hollow point bullets.

The next day the video game was removed from the Blue Ribbon. Since that time, Kozakiewicz, who reluctantly testified that he "got the message,"[1] has ob-

---

**1.** In a post trial memorandum, the district court stated:

The restaurant owner Kozakiewicz, called as a government witness, testified favorably to the defendants but at odds with his previous testi-

tained vending machines only from Hawley Enterprises, except for one machine rented from a Bridgeport police officer.

Hawley took the stand in his defense and admitted that he went into the bar and pulled his gun. However, he stated that he went into the bar with D'Onofrio, not Curcio, and that he was there to buy cigarettes, not smash the video game. He stated that D'Onofrio smashed the machine for no apparent reason, and he had pulled his gun only because he thought the patrons were going to attack D'Onofrio.

D'Onofrio then took the stand and also testified that he and Hawley, not Curcio, had gone into the bar. He stated that he went into the bar to discuss wholesale cigarettes with the owner and got upset when he couldn't locate the owner. He testified that he had noticed the video game on his way in and thought it was owned by Hawley Enterprises. Frustrated in his search for the owner, D'Onofrio claimed to have decided to see how much money was in the machine, and because someone was playing the machine, he became further aggravated and grabbed a hammer from behind the bar which he used to smash the game.

D'Onofrio, whose version of events was bizarre, if not implausible on its face, was contradicted in numerous material particulars by other witnesses. Moreover, he admitted that a state court plea bargain in the Blue Ribbon incident had resulted in no additional time being added to sentences he was already serving for unrelated crimes. He also conceded that he could no longer be prosecuted for smashing the video game.

The government attempted to cross-examine both witnesses regarding two other incidents involving non-Hawley vending machines in local bars. According to the government's offer of proof, each incident involved a bar which had a Hawley vending machine but wanted it removed because the machine was not working. When Hawley failed to repair the machines, both bars then removed the Hawley machine from the premises after so advising the Hawley company. One bar replaced the Hawley machine with a machine from a competitor. Four masked gunmen vandalized one of the bars and beat up the bartender shortly after the Hawley machine was removed. In the case of the other bar, a masked gunman smashed the non-Hawley machine. However, the government conceded that the only evidence directly linking Curcio, Hawley or D'Onofrio to either incident was a threatening phone call in the case of the second bar by a caller identifying himself as Gus Curcio.

In a colloquy with the court, the government argued that evidence of these incidents was admissible under Fed.R.Evid.R. 404(b) [2] to show criminal intent and the lack of a mistake in the destruction of the video game at the Blue Ribbon. The government stated its intention, should the district court rule favorably to it, to provide witnesses to testify about these incidents should cross-examination fail to elicit satisfactory answers. Defendants offered numerous arguments against both cross-examination and admission of extrinsic evidence, their principal claims being that the prejudicial effect of the jury's learning of the other incidents outweighed any probative value and that neither Rule 404(b) nor Rule 608(b) [3] applied because of the lack of any

mony before the grand jury. The jury could have found, as the court would have, that much of his courtroom testimony was incredible. While he testified, Kozakiewicz's hands shook; he sat uneasily in the witness box; and he avoided looking in the direction of the defendants' table. Nevertheless, and albeit with apparent reluctance, Kozakiewicz testified, and the jury could believe, he had "got the message" not to use any non-Hawley machines.

**2.** Rule 404(b) states:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**3.** Rule 608(b) states:

(b) Specific instances of conduct. Specific instances of the conduct of a witness, for the

direct proof implicating Hawley or D'Onofrio in the incidents. The court thereupon permitted the government to cross-examine about the other incidents but indicated its view that a factual basis for the cross-examination had to be shown in the government's rebuttal.

The cross-examination thereupon proceeded, and Hawley admitted that a Hawley machine had been removed from one of the bars in question but denied knowledge of a dispute. He also denied knowledge of any business dealings with the other bar. D'Onofrio admitted that Hawley machines had been removed from both bars but also denied knowledge of any dispute in either case.

As already mentioned, the government represented that it would offer witnesses to the two incidents, and the district court permitted the cross-examination in light of that representation. However, the government had not subpoenaed the witnesses in question at the start of the trial, apparently because such evidence would be inadmissible as part of its main case under *United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980) (evidence of similar crimes refuting the possibility of mistake or lack of intent not admissible until such matters are put in issue). Once it became clear that the testimony of these witnesses might be admitted, the government attempted to locate them but they could not be served with process. After the government informed the court that the witnesses had "gone into hiding," the district court struck the cross-examination and admonished the jury to disregard it.

### DISCUSSION

The principal issue on this appeal is the propriety of the cross-examination of Hawley and D'Onofrio with regard to other incidents of violence directed at taverns which had caused Hawley machines to be removed. Defendants argue that the government's failure to present evidence either of the incidents or of the defendants' or D'Onofrio's involvement therein renders the cross-examination impermissible as lacking a basis in fact and as irrelevant. We disagree.

Dealing first with the question of whether the cross-examination was factually unfounded, we note that the issue is not resolved by the government's failure to offer live testimony in support of the factual assumptions underlying the questions. That failure was satisfactorily explained by the disappearance of the witnesses in question, and no claim is made that in fact they were available at the pertinent time. The issue is rather whether the government had in its possession sufficient evidence of the incidents in question to justify posing questions based on such damaging factual assumptions, *see ABA Standards Relating to the Administration of Criminal Justice: The Prosecution Function* § 5.7(d).

■ We have examined the record, including the Jencks material turned over to the defense before trial, and have concluded that a good faith and objectively reasonable basis for the cross-examination clearly existed. FBI and local police investigative reports relating to both incidents, and grand jury testimony with regard to one incident, provided ample grounds to believe that disputes over Hawley machines had resulted in violence in the bars in question. This material was available to the defense before the cross-examination got under way, and the only objection made as to the factual predicates for the questions related to the lack of proof that the defendants or D'Onofrio had committed or ordered the violent acts. However, because the questions contained no implications about any such direct involvement, this objection went to relevance rather than to a lack of a good

---

purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

faith factual foundation for these questions. We reject, therefore, the claim that the cross-examination was factually unfounded.

■ We also reject the claim that it was irrelevant or unduly prejudicial. It is true that there is no direct evidence that Hawley or D'Onofrio either ordered or committed the violence on the prior occasions. The cross-examination was not intended to demonstrate any such direct involvement, however, but rather to probe into the plausibility of the version of events at the Blue Ribbon given at trial by Hawley and D'Onofrio. Hawley was a part owner and President of Hawley Enterprises. D'Onofrio was also a part owner and a self-described "problem solver" for the firm. There was evidence that each was aware of the location of Hawley machines and intimately familiar with the business of the firm. Under such circumstances, cross-examination with regard to prior violence reasonably designed to forestall competitive inroads on Hawley Enterprises' business was a proper testing of the credibility of the spur of the moment, crime of passion version of events at the Blue Ribbon. If the jury were to accept the testimony that D'Onofrio rather than Curcio destroyed the machine, it might reasonably consider why the prior incidents had not alerted Hawley and D'Onofrio to the peculiar vulnerability of dissatisfied Hawley customers to violence and led them to have behaved more cautiously at the Blue Ribbon, if not to have avoided it altogether. While the relationship of such prior incidents to the events at the Blue Ribbon would normally be attenuated (apart from proving the element of instilling fear), the unusual version of those events offered by the witnesses justified the cross-examination to test the claimed lack of intent. Since Judge Burns instructed the jury to disregard the questioning, defendants obtained a ruling more favorable than warranted.

■ Turning now to other claims of error, Curcio argues that the government should have been forbidden to elicit testimony from the bar owner that he was aware at pertinent times that Curcio had been recently indicted for an unrelated incident of extortion. Recognizing that evidence of an extortion victim's state of mind is relevant in Hobbs Act cases, *United States v. Kennedy*, 291 F.2d 457, 458 (2d Cir.1961), Curcio argues that he was charged only with attempted extortion and the government did not have to prove that Kozakiewicz was placed in fear. Were such evidence indeed not necessary, its prejudicial value would then outweigh its probative effect.

However, there is no authority for the proposition that evidence of a defendant's reputation known to the victim is inadmissible when attempted extortion, as opposed to extortion, is charged. To the contrary, an effort to instill fear is a necessary requirement in extortion cases under 18 U.S.C. § 1951, and a failure to prove such an effort, even when only an attempt is charged, would lead to a directed verdict for the defendant. *United States v. Gambino*, 566 F.2d 414, 419 (2d Cir.1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978); *Carbo v. United States*, 314 F.2d 718, 741 (9th Cir.1963), *cert. denied*, 377 U.S. 953, 84 S.Ct. 1626, 12 L.Ed.2d 498 (1964).

■ Curcio also raises as error the district court's denial of his motion *in limine* to prevent the government from introducing a recent unrelated loansharking conviction to impeach him should he take the stand. However, he neither testified at trial nor made an offer of proof regarding the content of his testimony and, as a result, failed to preserve the error. *Luce v. United States*, — U.S. —, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984).

■ Both appellants argue that the jurisdictional requirement of 18 U.S.C. § 1951, proof of an effect on interstate commerce, was not fulfilled. The district court found the requisite effect in the evidence that the bar purchased liquor and other commodities in interstate transactions. We agree with that conclusion. The effects on interstate commerce of the defendants' extor-

tionate behavior need only be "potential or subtle." *United States v. Angelilli*, 660 F.2d 23, 35 (2d Cir.1981), *cert. denied*, 455 U.S. 910, 945, 102 S.Ct. 1258, 1442, 71 L.Ed.2d 1449 (1982). Moreover, the appellants were charged with attempted extortion, and an actual effect need not be shown, only a possibility thereof. *See United States v. Jannotti*, 673 F.2d 578, 592 (3d Cir.1982) (some "threatened effect"), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *United States v. Rosa*, 560 F.2d 149, 153 (3d Cir.) (jurisdiction for attempt exists when acts, if completed, would have some effect), *cert. denied*, 434 U.S. 862, 98 S.Ct. 191, 54 L.Ed.2d 135 (1977). Given that extortionate activities directed at the bar might well affect its interstate purchases, the government's evidence, if credited, was sufficient as a matter of law.

■ Appellants also argue that the effect on interstate commerce was for the jury to determine, not the district court. Again we disagree. The district court must determine whether the evidence adduced is sufficient as a matter of law to fulfill the jurisdictional requirement of the statute. *United States v. Augello*, 451 F.2d 1167, 1170 (2d Cir.1971), *cert. denied*, 405 U.S. 1070, 92 S.Ct. 1518, 31 L.Ed.2d 802 (1972). Whether that evidence is to be credited is for the jury and was properly submitted to it in the instant case.

Finally, appellants argue that there was insufficient evidence to support their convictions. This contention is utterly without merit.

Affirmed.