**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**David O'MALLEY & Robert Salerno,
Defendants-Appellants.**

Nos. 85–1944, 85–2262.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 12, 1986.

Decided July 9, 1986.

Leland Shalgos, Lynch & Shalgos, Allan A. Ackerman, Chicago, Ill., for defendants-appellants.

Deborah A. Devaney, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, COFFEY and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

The defendants, David O'Malley and Robert Salerno, were indicted with six other persons for RICO racketeering, racketeering conspiracy and multiple counts of attempted extortion and extortion, in violation of 18 U.S.C. §§ 1962(c), (d) and 1951. Following a seven-week trial, O'Malley was found guilty of racketeering conspiracy (Count I), racketeering (Count III) and thirteen separate counts of extortion, including the attempted extortion of a theater movie owner (Count XX). Salerno was found guilty of racketeering conspiracy (Count I), racketeering (Count VII), attempted extortion of a movie theater owner (Count XX) and extortion (Count XXXI). The district court had earlier entered judgment for Salerno dismissing Count XVI that charged him with extortion. O'Malley was sentenced to ten years imprisonment for his conviction on the RICO conspiracy and racketeering counts to be followed with five years probation for his conviction on the extortion counts and Salerno was sentenced to four years imprisonment for his conviction on the RICO conspiracy and racketeering counts, also to be followed with five years probation for his conviction on the extortion counts. They filed this joint appeal. We affirm.

I

The evidence reveals that the defendants participated in a conspiratorial enterprise to extract "street taxes" from various legitimate and non-legitimate businesses in the Chicago, Illinois metropolitan area from 1973 until 1983. A "street tax" is a slang phrase describing extortion payments made by the victims to the defendants to allow them to remain in business. The "street tax" conspiracy was divided into three separate ventures: extorting money from automobile salvage yards, bookmakers, and a theater owner. It was established at

trial that O'Malley, along with John Manzella, not a party to this appeal, extorted money from at least seven different automobile yards. For example, Martin Citron, a partner in Chippewa Sam's Auto Parts received a visit from three unindicted co-conspirators in March 1982 who demanded $10,000 in street taxes; Citron refused to pay. Citron subsequently met with Manzella and O'Malley. Manzella told Citron that his people "were not happy" with Citron's refusal to pay the extortion money and told Citron that "you either pay or you go out of business." O'Malley then threatened "to chop his hands off" if Citron refused to pay. Citron became a nervous wreck and folded his business two months later.

Salerno was involved in extorting money from bookmakers in the Chicago metropolitan area. The government introduced evidence that Manzella had extorted money from bookmakers in the Chicago area, including Carol Ellison, David Kopulous and Steve Hospodar. Specifically, in 1979, Manzella introduced Hospodar to Salerno and told Hospodar that Salerno would be collecting the money in the future. Salerno telephoned Hospodar and demanded that Hospodar advance the dates for the extortion payments, but Hospodar refused. Approximately one week later Manzella called Hospodar and instructed him to go to the Sky View Restaurant in Chicago; Salerno, Manzella and two of the other extortionists attended this meeting. Salerno told Hospodar that "you don't talk to me on the phone the way you did. I want you to know I am the enforcer around here." One month later, in January 1980, Hospodar's office on his car lot burned to the ground. In a subsequent conversation with Hospodar, Manzella told him that he "expected it," referring to the fire.

Both Salerno and O'Malley participated in an attempt to extort money from theater owner, Joel Ross. Ross was approached by Salerno and three other extortionists in May 1983 and was told by Salerno that "if you don't belong to somebody, you belong to us." Salerno told Ross that the theaters in the Chicago area were paying $10,000

per month and that he (Salerno) expected this same amount of money from him. Ross testified that he avoided subsequent calls from Salerno, but Salerno eventually was able to contact Ross and told him that if he (Ross) did not cooperate he would "pick up" Ross' wife and son. Ross explained to Salerno that his movie house was involved in bankruptcy proceedings and that he could not afford to make extortion payments. In December of 1983, O'Malley and Garelli, not a party to this appeal, approached Ross and told him that they "had been sent by the people that had been there before and that they were one big happy family and I was going to do what they told me to do." Tr. at 157. Salerno subsequently called Ross in mid-December 1983 and explained that Ross would have to talk to "these people" as it was no longer Salerno's area. Tr. at 159. Within hours of this conversation, O'Malley and Garelli again appeared at the theater and demanded $5,000 per month from Ross to stay in business. Ross again explained that he did not have the money to give them. After several more unsuccessful attempts to obtain the money from Ross, O'Malley told him "you'll have to suffer the consequences." Tr. at 163. Ross testified that he did not see O'Malley or Salerno again until trial.

On appeal, Salerno and O'Malley raise a plethora of issues, including: (1) whether the district court's RICO conspiracy jury instruction failed to define the essential elements of the crime; (2) whether the jury instruction defining the interstate commerce element of the Hobbs Act Count (18 U.S.C. § 1951) was worded so as to improperly direct a verdict against the defendants; (3) whether the court committed prejudicial error in allowing the government to present evidence to impeach its own witness and in allowing the government to argue in closing argument the facts relating to a substantive count dismissed by the court as evidence of Salerno's participation in the RICO conspiracy; (4) whether the court failed to order Jencks Act material produced for *in camera* inspection; (5)

whether the court improperly allowed prejudicial coconspirator declarations into evidence; and (6) whether the evidence is sufficient to support Salerno's conviction for extorting money from bookmaker Steve Hospodar (Count XXXI).

## II

### RICO Conspiracy Jury Instruction

■ Both defendants argue that the RICO conspiracy instruction was fatally flawed as it failed to instruct the jury on two elements of the RICO conspiracy: personal participation in the conspiracy and a pattern of racketeering activity. Before the jury was instructed, the court met in chambers with the attorneys to review the proposed jury instructions. This conference was not transcribed by a court reporter.[1] After the jury was instructed, the court asked the defendants to memorialize their objections registered at the instruction conference. The defense attorney for O'Malley stated only that he objected "generally to all the instructions. I don't want to go over them in particular, Judge.... I'm going to adopt any other objections that counsel make." Tr. 4091. The court then noted for the record the objections registered at conference by the other de-

fense attorneys. Tr. 4091–99. No attorney objected to instruction No. 46, the RICO conspiracy jury instruction that defendants now complain was fatally flawed. It is clear that absent a specific objection, as contrasted with a general objection, "stating distinctly the matter to which he objects and the grounds for his objection," the court may not reverse a conviction based upon an erroneous instruction absent "plain error" since the alleged error is deemed waived. *United States v. Markowski*, 772 F.2d 358, 363 (7th Cir.1985); *United States v. Watson*, 623 F.2d 1198, 1204 (7th Cir.1980) (failure to make specific objection "to alleged omissions precludes our review ... absent a determination that the omissions constituted plain error."); Fed.R. Crim.P. 30.[2] With this standard of review in mind, we turn to the other jury instructions in this case.

The defendants allege that the court erroneously instructed the jury that it could convict the defendants on the RICO conspiracy count based upon acts that they did not perform or participate in. In instruction 46, the court informed the jury that in order to establish the agreement element of the RICO conspiracy count the government must prove:

1. We noted in *United States v. Murphy*, 768 F.2d 1518, 1535 (7th Cir.1985) that it is permissible for the court to hold the jury instruction conference in chambers without the presence of a court reporter as long as the judge allows the parties to state their objections to the instructions for the record at the conclusion of the instruction conference. The record fails to reveal that any of the defendants requested that the jury instruction conference be transcribed.

2. In *United States v. Murphy*, 768 F.2d 1518 (7th Cir.1986), this court stated that:

"[w]e therefore think it necessary for an appellate court, when reviewing a trial in which the instruction conference was not transcribed, to indulge all reasonable inferences favorable to the defendant."

*Id.* at 1536. The defendants request that since the jury instruction conference was not transcribed in this case, we should "indulge all reasonable inferences" and assume that they registered specific objections to the jury instructions. *Murphy*, however, is distinguishable since "[d]espite Murphy's objection, the district

judge conducted the conference about the instructions to the jury in his chambers and off the record. The conference lasted some five hours. Counsel maintained that they could not adequately remember what happened in order to preserve their objections." *Id.* at 1535. In our case, the defendants failed to request that the jury instruction be transcribed, nor do they allege that the conference lasted so long or the instructions were so difficult that they "could not adequately remember what happened in order to preserve their objections." Our review of the pleadings in this case containing those instructions that were either given or not given by the district court reveals that no defendant objected to instruction No. 46. Further, since the defendants had the opportunity to memorialize their objections for the record after the jury was instructed, and since no counsel objected to instruction No. 46 at trial when given the opportunity to register an objection, under these circumstances, their right to argue on appeal that instruction 46 is erroneous must be considered waived and any alleged error is not reversible unless it is plain error.

"[T]hat each defendant knowingly became a member of the conspiracy; that is each defendant agreed by committing two or more acts of extortion, attempted extortion or intimidation to participate, either directly or indirectly, in the affairs of the enterprise previously defined...."

In instruction 47, the court further explained the proof necessary to establish the conspiracy:

"In determining whether the alleged conspiracy existed, you may consider the actions and statements of all the alleged participants. *The agreement may be inferred from all the circumstances and the conduct of all the alleged participants.* Additionally, each defendant's agreement in this case may be inferred from the commission by that defendant of two or more racketeering acts." (Emphasis added).

The defendants argue that because Salerno was convicted of two separate Hobbs Act counts, 18 U.S.C. § 1951 (Counts XX and XXXI) and O'Malley was convicted of thirteen unrelated counts of extortion and attempted extortion (the only common conviction being Count XX for the attempted extortion of theater owner Ross), the jury instructions were erroneous since "the court supplied the jury with a way to find the defendants guilty where they did not at all participate in some or another of the predicate acts." Defendants' Brief at 29.

■ Although the defendants' argument is phrased in terms of a challenge to the court's jury instructions, they are really alleging that their cases were improperly joined in a single trial in violation of Fed.R.

Crim.P. 8(b) and 14,[3] and thus should have been severed.[4] We rejected a similar misjoinder argument in *United States v. Lee Stoller Enterprises, Inc.,* 652 F.2d 1313 (7th Cir.1981) (en banc).

"Under RICO, *it is irrelevant that each defendant participated in the enterprise's affairs through different and unrelated crimes. United States v. Elliott,* 571 F.2d 880, 902 (5th Cir.), *cert. denied sub nom. Delph v. United States,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978).... Although the defendants used different means, they were alleged to have participated in the same offense: furtherance of the enterprise. Therefore, severance was not required. *United States v. Bright,* 630 F.2d 804, 812–13 (5th Cir.1980)."

*Id.* at 1319 (emphasis added). Thus, according to our decision in *Lee Stoller Enterprises,* the fact that the defendants participated in different predicate acts does not mean that they cannot be convicted of participating in the same RICO conspiracy to further the enterprise of collecting "street taxes."

■ The trial court properly noted in its instructions to the jury that the jury may infer from the direct and circumstantial evidence presented that the defendants agreed to become members of the RICO conspiracy. *See United States v. Redwine,* 715 F.2d 315, 320 (7th Cir.1983) ("the government need not establish ... a formal agreement to conspire; circumstantial evidence and reasonable inferences drawn [from the circumstantial evidence] concern-

3. Fed.R.Crim.P. 8(b) provides:

"Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count."

Fed.R.Crim.P. 14 provides:

"If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial to-

gether, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires."

4. Our examination of the record reveals that defendants failed to file any motion prior to trial requesting a severance. Thus, they have decided to do indirectly what they failed to do directly and challenge the jury instructions alleging that these instructions allowed the jury to convict them of RICO conspiracy based upon the unrelated acts of co-conspirators. This claim, as will be discussed in this opinion, is without merit.

ing the relationship of the parties, their overt acts, and the totality of their conduct may serve as proof.") Thus, the jury was instructed that in order to find a RICO conspiracy they must find that "each defendant knowingly became a member of the conspiracy; that each defendant agreed by committing two or more acts of extortion, attempted extortion, or intimidation to participate directly or indirectly in the affairs of the enterprise...." [5] The court further explained that "the agreement could be inferred from the commission by the defendant of two or more racketeering acts" but cautioned that "[i]n determining whether each defendant became a member of the conspiracy, you may consider only the acts and statements of that particular defendant." Therefore the jury was instructed that it was to consider only the acts of the defendant in determining whether or not he joined the conspiracy and that the defendants' participation in the substantive racketeering activities could be considered as evidence of their agreement to participate in a single RICO conspiracy to collect "street taxes." These instruc-

tions were consistent with *United States v. Melton*, 689 F.2d 679, 683 (7th Cir.1982) (noting that an "inference of an agreement" to conspire under RICO may be drawn from "several acts of racketeering in furtherance of the affairs of the enterprise") and *Lee Stoller Enterprises, Inc.*, 652 F.2d at 1319 (noting that the trial protected "each defendant's rights by instructing the jury that it should consider the evidence separately as to each defendant in each count.") Thus, we hold that the defendants' right to be convicted by only that evidence which evinced their participation in the conspiracy was more than adequately protected in the court's instructions.[6]

■ The defendants next assert that the RICO conspiracy instruction was fatally flawed since it failed to include the words "pattern of racketeering activity." The instructions submitted to the jury stated that:

"First, that during some or all of the period between sometime in 1973 and continuing to September 25, 1984, there existed a conspiracy to conduct or participate in the conduct of affairs of the

**5.** The defendants note that there is a split in the circuits regarding whether a defendant may be convicted of a RICO conspiracy pursuant to 18 U.S.C. § 1962(d), even though he has not been convicted of personally participating in two or more predicate acts. *Compare United States v. Adams*, 759 F.2d 1099 (3d Cir.1985) (defendant needs only agree to the commission of the predicate acts, he did not personally participate in those acts); *United States v. Carter*, 721 F.2d 1514, 1529–31 (11th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984) (same); *United States v. Tille*, 729 F.2d 615, 619 (9th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984) (same) *with United States v. Ruggiero*, 726 F.2d 913, 921 (2d Cir.1983), *cert. denied*, —— U.S. ——, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984) (personal commission of two or more predicate acts required for RICO conspiracy conviction); *United States v. Winter*, 663 F.2d 1120, 1136 (1st Cir.1981), *cert. denied*, 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 479 (1981). We recently decided in *United States v. Neapolitan*, 791 F.2d 489, 492 (7th Cir.1986) to adopt the Eleventh Circuit's approach in *Carter* that the government need not establish that the defendant personally agreed to commit two predicate acts to establish his participation in the RICO conspiracy. Rather, the government need only prove that the defendant entered into an agreement "with knowledge that the goal of the con-

spiracy is the commission of the RICO violation, that is to 'conduct or participate in the affairs of an enterprise through a pattern of racketeering activity.'" *Id.* Thus, the court's instruction in this case requiring the jury to find that the defendants personally committed two predicate acts before they could be convicted of violating the RICO conspiracy statute was not necessary in light of our recent decision in *Neapolitan, supra*.

**6.** Here, the RICO enterprise consisted of the defendants collecting "street taxes" and ample evidence presented at trial (which the defendants do not challenge on appeal) disclosed that the defendants, through their acts of extortion, agreed to further the enterprise's illegal activity of collecting "protection money." The defendants at times divided their efforts, with O'Malley collecting the money from the auto yards and Salerno collecting money from the bookmakers. At other times they approached the same victim. For example, Salerno unsuccessfully attempted to extort money from theater owner Ross. Several months after this unsuccessful attempt, O'Malley approached Ross and told him, referring to Salerno and the other extortionist, that he (O'Malley) had been sent there by those who had preceded him and described the group as "one big happy family."

enterprise, *which was previously defined, through the commission of two or more acts of extortion, attempted extortion or intimidation...."* (Emphasis added).

The rule in this circuit is that, "[i]n determining the propriety of instructions they are to be viewed as a whole, and as long as the instructions treat the issues fairly and accurately they will not be interfered with on appeal." *United States v. Croft,* 750 F.2d 1354, 1366 (7th Cir.1984) (*quoting United States v. Ray,* 683 F.2d 1116, 1127 (7th Cir.), *cert. denied,* 459 U.S. 1091, 103 S.Ct. 578, 74 L.Ed.2d 938 (1982)). In this case, although the magic words "pattern of racketeering activity" were not recited in the RICO conspiracy instruction, the substance of the definition of what constitutes a pattern of racketeering activity was adequately described and defined by the court as it informed the jury that "the affairs of the enterprise" had to be conducted "through the commission of two or more acts of extortion...." [7] Further, the jury instruction concerning the substantive RICO violations informed the jury that a "pattern of racketeering activity" means "at least two acts involving either extortion or intimidation ..." and that "two acts are connected ... by some common scheme or pattern...." Thus, the jury instructions, when viewed in their entirety and not just in isolation, fairly and adequately informed the jury that in order to convict the defendants of participating in the RICO conspiracy, a pattern of racketeering activity must exist.

### Hobbs Act Interstate Commerce Instruction

The court instructed the jury that the government must establish the defendants' extortion or attempted extortion affected interstate commerce. The court then stated:

"Thus, I instruct you that if you find that the government has proven beyond a reasonable doubt that the person or persons named in that particular Count purchased for use in his business goods or services that had come originally from outside Illinois, and that as part of the alleged extortion or attempted extortion charged in that particular Count, money would have been obtained that could have been used for such purchases, then I instruct you as a matter of law that commerce was affected."

The defendants alleged that this instruction improperly directed a verdict against them since the jury had "to accept the government's theory of how commerce was affected...." Defendants' Brief at 39.

The defendants' argument is similar to one that we rejected in *United States v. Kuta,* 518 F.2d 947, 951 (7th Cir.), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975). In *Kuta* the court instructed the jury that if it found that the goods used in a project that was the subject of the extortion payment came through interstate commerce, then the jury must find as a matter of law that interstate commerce was affected. In response to the defendants' argument that this instruction improperly directed a verdict against the defendants, we stated that the ultimate determination of whether interstate commerce is affected is a question of law: "It was for the jury to determine if the facts occurred, but that the trial court should determine if commerce was affected." *Id.* at 952 (*citing United States v. Hyde,* 448

---

**7.** At oral argument it was brought to the attention of the court that the trial transcript revealed the district court judge stated "there existed a conspiracy to conduct ... the affairs of the enterprise ... through the commission of *one or two acts* of extortion ..." and not *"two or more* acts of extortion...." (emphasis added). It is unclear as to whether the court actually instructed the jury in this manner or, as suggested by the government, whether the highlighted portion of the jury instruction in the trial transcript is merely a typographical error of the court reporter. Assuming that there was a "slip of the tongue" and the judge instructed the jury in this manner, we deem it harmless error. No objection to the jury instruction was made and a proper written jury instruction was tendered to the jury for their consideration in their deliberations. Further, throughout the trial and when the court instructed on the substantive RICO racketeering counts the court noted that "pattern of racketeering activity" meant at least the commission of two or more acts of extortion.

F.2d 815, 839 n. 34 (5th Cir.1971), *cert. denied,* 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972). *See also United States v. Curcio,* 759 F.2d 237, 241 (2d Cir.1985); *United States v. Calder,* 641 F.2d 76, 78 (2d Cir.), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981). In *Kuta,* we further stated that "[t]he defendant's argument fails to draw the distinction between factual determinations which the jury must make and the legal impact of those determinations which the trial court is competent to evaluate." *Kuta,* 518 F.2d at 952.

■ The district court's instruction in this case followed the depletion of assets theory approved by this court in *United States v. Mattson,* 671 F.2d 1020, 1024 (7th Cir.1982).[8] The instruction informed the jury that it must find interstate commerce was affected if it determined that the victims' businesses purchased goods in interstate commerce and that the money paid to the defendants by the victims could have been used for the purchase of the goods from outside of the State of Illinois. Thus, the jury was to find whether the facts elicited at trial were sufficient to establish the interstate commerce connection. If they determined the facts to be sufficient, they were instructed to find that the interstate commerce element of the Hobbs Act count was satisfied. In light of this court's holding in *Kuta,* we hold that this jury instruction was proper.[9]

### Agent Elder's Testimony

Shelly Fishman, one of the auto dealers victimized in the defendants' extortion scheme, identified Salerno from an FBI photospread in February of 1983 as one of several men who "shook him down" for protection money in a parking lot in October, 1982. At trial Fishman did identify O'Malley and several other co-conspirators as the persons who extorted money from him in the parking lot, but at trial as contrasted with his previous statement to the FBI identifying Salerno from the photospread as one of the extortionists, he recanted and testified that Salerno was not one of the men who participated in the extortion. The government then called FBI Agent Elder who testified that Fishman previously identified Salerno from a photospread as one of the men who extorted money from him. At the end of the trial, the court dismissed Count XVI against Salerno that alleged he had extorted money from Fishman, reasoning that since Fishman expressly disclaimed at trial that Salerno was one of the extorters, the court deemed the evidence on this count to be insufficient to present to the jury. The government was allowed, however, to argue in closing argument the evidence surrounding Salerno's participation in the extortion as it related to the RICO conspiracy count. Salerno complains that the government called Fishman to testify as a "subterfuge" in order to introduce Agent Elder's testimony, under the "guise of impeachment," as substantive evidence of Fishman's prior identification of Salerno as one of the extorters. Salerno further argues that it was improper to allow the government to argue in closing argument the evidence concerning Saler-

---

8. In *Mattson, supra,* we explained the depletion of assets theory in the following terms:
   "Under the depletion of assets theory, commerce is affected when an enterprise, which either is actively engaged in interstate commerce or customarily purchases items in interstate commerce, has its assets depleted through extortion, thereby curtailing the victim's potential as a purchaser of such goods." *Id.* at 1024 (*quoting United States v. Elders,* 569 F.2d 1020 (7th Cir.1978).

9. Defendants also argue that the indictments were constructively amended since the jury instruction defining interstate commerce directed a verdict against them. As previously noted,

this jury instruction was entirely proper. Further, the fact that the government relied on the depletion of assets theory at trial and did not allege in the indictment that it would prove the affect on interstate commerce pursuant to this theory, does not establish that the indictment was improperly amended. Indictments are to plead the elements of the crime and the necessary facts to establish those elements. The defendants have failed to cite any case law, nor are we aware of any case law, requiring the government to set forth in its indictment the theory that it intends to use at trial to establish the elements of the crime.

no's participation in the extortion as evidence of his intent to join the RICO conspiracy since the substantive extortion count had been dismissed by the trial court.

■ A review of the record discloses that Agent Elder's testimony was admitted by the court as substantive evidence under Fed.R.Evid. 801(d)(1)(C) [10] providing that "a statement is not hearsay if . . . [t]he declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (C) one of identification of a person made after perceiving him. . . ." In this case, Fishman testified at trial that he had identified Salerno before trial as one of the persons who extorted the money from him, but at trial recanted this statement and denied that Salerno had extorted money from him. Further, he was subject to cross-examination concerning his earlier statement made before trial identifying Salerno as one of the extortionists. Thus, Elder's testimony was properly admitted since the elements of Rule 801(d)(1)(C) were satisfied. *See United States v. Jarrad,* 754 F.2d 1451 (9th Cir.1985); *United States v. Elemy,* 656 F.2d 507 (9th Cir.1981). Salerno's reliance on *United States v. Hogan,* 763 F.2d 697 (5th Cir.1985) and *United States v. Webster,* 734 F.2d 1191 (7th Cir.1984) is inapposite. Both cases condemned the practice of the government calling a witness, knowing in advance that he would give unfavorable testimony, in order to impeach his testimony by introducing hearsay evidence against the defendant under Fed.R.Evid. 607 since the "purpose [of introducing the hearsay evidence] would not be to impeach the witness but to put in hearsay as substantive evidence against the defendant" that would otherwise be inadmissible. *Webster,* 234 F.2d at 1192. We initially note that the record does not reflect, nor have the defendants presented, any evidence whatsoever establishing that the government had any knowledge that Fishman would recant his prior testimony and not identify Salerno at trial. Further in our case, the trial court admitted Elder's testimony regarding Fishman's identification of Salerno not as impeachment evidence under Rule 607 but as independently admissible substantive evidence under Rule 801(d)(1)(C). Tr. 3480. Nothing in this rule prohibits the introduction of out-of-court statements identifying the defendant made by the declarant who at trial admitted that he made the prior identification but now denies that the defendant was the same involved in the crime. *Weinstein's Evidence,* ¶ 801(d)(1)(C)[01] (1984); Graham, *Federal Rules of Evidence,* § 801.12 (1984). *See also Elemy,* 656 F.2d at 508. Since Agent Elder's testimony was independently admissible under Fed.R.Evid. 801(d)(1)(C) (and Salerno does not contend otherwise) and was not introduced as hearsay impeachment under Rule 607, his testimony was properly admitted at trial.

■ Salerno next argues that since the trial court had earlier dismissed the substantive count alleging that Salerno had attempted to extort money from Fishman, it was improper for the government to argue in closing argument that Fishman's previous identification of Salerno from the photospread as one of the participants in the extortion of Fishman was evidence of his agreement to join a single RICO conspiracy. We need not reach the issue of whether this argument was improper as there was ample evidence, apart from Salerno's alleged participation in extorting money from Fishman in the parking lot in October 1982, concerning his racketeering acts and agreement to join the conspiracy. Specifically, the jury found that Salerno committed two separate acts of extortion when he attempted to extort from theater owner Joel Ross and extorted money from bookmaker Steve Hospodar (Counts XX and XXXI). When a defendant has personally committed several acts of racketeering in furtherance of the enterprise's affairs, the "inference of an agreement [to join the conspiracy] is unmistakable." *United States v. Elliott,* 571 F.2d 880, 903 (5th Cir.1978). Further, after Salerno unsuc-

---

10. *See* Tr. 2789, 3480.

cessfully attempted to extort money from Ross, Ross was approached by O'Malley who announced that he had been sent by the individuals who previously visited Ross. O'Malley described the group to Ross as "one big happy family." Salerno subsequently called Ross and told him that he (Ross) would have to "talk with these people," as it was no longer Salerno's "area." Several hours later, O'Malley returned with another person and demanded $5,000 per month if Ross wished to stay in the theater business. This evidence of Salerno's and O'Malley's participation in an attempt to collect extortion payments from Ross is persuasive evidence of their agreement and participation in the RICO conspiracy to extort money in furtherance of the enterprise's efforts to collect "street taxes." Further, the Chicago Police Department's intermittent surveillance of the defendants' activities between October 1982 and April 1984 reveal that O'Malley and Salerno were well-acquainted as they were observed meeting on several occasions with Manzella and Cataudella, two other co-conspirators charged with the collection of "street taxes." [11] For example, Salerno, O'Malley and Cataudella were seen together on February 25, July 12, October 24 and November 14, 1983. Thus, even if we were to decide that it was error for the courts to allow the government to argue the evidence of Salerno's participation in the extortion of Fishman as evidence of Salerno's agreement to participate in the conspiracy, there was more than enough other evidence demonstrating Salerno's agreement to participate in the RICO conspiracy to collect "street taxes," and thus any alleged error was at best harmless.

### Jencks Act

■ Salerno next contends that the district court committed prejudicial error when it refused to order the prosecutor to produce his notes, under the Jencks Act, 18 U.S.C. § 3500, of a pre-trial interview with Steve Hospodar, a bookmaker who was one of the victims of the defendants' extortion scheme. Salerno requests that his convictions be vacated and the case remanded for an *in camera* review of the prosecutor's notes.

Salerno relies on *United States v. North American Reporting, Inc.*, 740 F.2d 50 (D.C.Cir.1984), where the Court of Appeals held that the prosecutor's notes of his discussion with a witness were not protected work product if those notes were producible under the Jencks Act. As *North American Reporting, Inc.* stated, "the Supreme Court has held unequivocally that the work product doctrine does not bar the production of the notes of government attorneys *that are otherwise producible under the Jencks Act.*" *Id.* at 55 (*citing Goldberg v. United States*, 425 U.S. 94, 105–08, 96 S.Ct. 1338, 1345–47, 47 L.Ed.2d 603 (1976)). The Jencks Act permits a defendant to discover a statement or report made by a government witness once that witness has testified on direct examination. 18 U.S.C. § 3500(a) and (b). The Jencks Act defines a "statement" as "(1) a written statement made by said witness and signed or otherwise adopted or approved by him...." 18 U.S.C. § 3500(e)(1). The reason that the Jencks Act requires the witness to sign or otherwise approve the statements is that the witness may be impeached by this evidence. *Palermo v. United States*, 360 U.S. 343, 349, 354, 79 S.Ct. 1217, 1223, 1225, 3 L.Ed.2d 1287 (1959). Obviously, if the witness has not expressly approved the statements, it would be unfair to use this evidence to impeach him. In this case, Hospodar testified under cross-examination that he had neither seen the prosecutor's notes of the conversation, nor had the notes been read to him. Thus, since the notes had not been written, signed, adopted or approved by the witness, the notes failed to qualify as "statements" within the meaning of the Jencks Act and were not subject to the Jencks Act discovery rules. *See United States v. Hogan*, 763 F.2d 697, 704 (5th

---

**11.** Manzella was the person who introduced bookmaker Hospodar to Salerno and told Hospodar that Salerno would be responsible for collecting the "street taxes."

Cir.1985); *United States v. Konefal,* 566 F.Supp. 698, 708 (N.D.N.Y.1983).

Admission of Co-conspirators' Statements

■ In December, 1979, Steve Hospodar, met with Salerno, Manzella and two other persons involved in the conspiracy concerning Hospodar's resistance to Salerno's request to move up the payment dates for "street tax." Approximately one month after this meeting, Hospodar's office at his car lot burned to the ground under suspicious circumstances. Salerno testified that the Chicago Fire Department subsequently advised him that the fire was not caused by arson. At trial, Hospodar testified that he had a conversation with Manzella approximately one week after the fire and Manzella told him that he (Manzella) had "expected it," referring to the fire. Hospodar also testified that he believed Salerno was the person responsible for the fire. This later portion of his testimony was admitted as evidence of Hospodar's state of mind, pursuant to Fed.R.Evid. 803(3). On appeal, Salerno "questions whether the particular statement about the fire could conceivably be construed to be 'in furtherance' of the conspiracy." Defendants' Brief at 46.

In *United States v. Gironda,* 758 F.2d 1201 (7th Cir.1985), this court reiterated the standard for admission of co-conspirators' statements at trial: "The Government must prove, by evidence independent of the challenged statement, that a conspiracy existed. Also, it must prove that the hearsay declarant and the defendant against whom the statement is offered are members of the conspiracy. Finally, the government must establish that the statement was made during the course of and in furtherance of the conspiracy." *Id.* at 1217 (*citing United States v. Coe,* 718 F.2d 830, 835 (7th Cir.1983); Fed.R.Evid. 801(d)(2)(E). In reviewing the admissibility of a co-conspirator's statements, we will not reverse the district court's decision unless it clearly erred in admitting this evidence. *United States v. Conn,* 769 F.2d 420, 423 (7th Cir.1985). The only element of Fed.R.Evid. 801(d)(2)(E) that Salerno challenges on this question in this appeal is whether Hospodar's testimony regarding the fire could be construed to be "in furtherance" of the conspiracy. In this case, the fire occurred approximately one month after Hospodar met with Salerno, Manzella and the other extorters regarding Hospodar's resistance to Salerno's continued pressure to make the street tax payments earlier in the month. At this meeting, Salerno expressed his displeasure with Hospodar's resistance to advancing the payment dates of the street tax and announced that he was the "enforcer." Manzella's statement that he (Manzella) "expected it" (the fire) certainly could be construed as an attempt on his (Manzella's) part to put added pressure on Hospodar to convince Hospodar to continue making payments. Hospodar in fact testified that he continued to pay the street tax for a period of one year after this meeting with Salerno. Thus, Manzella's reference to the fire was made during the course of the conspiracy and his comment might very well be interpreted as an attempt to strike fear into Hospodar to ensure that he (Hospodar) continued to deliver timely payments to the conspirators. Thus the statements concerning the fire were clearly made "in furtherance" of the conspiracy.[12]

Sufficiency of Evidence

■ Salerno finally argues that there was insufficient evidence to convict him of extorting money from Hospodar (Count XXXI) in violation of the Hobbs Act, 18 U.S.C. § 1951. Specifically, he contends that the extortion of Hospodar did not affect interstate commerce and that in any event Hospodar did not fear Salerno and thus he could not have been a victim of any

12. Salerno does not argue that Hospodar's statement testimony that he (Hospodar) believed Salerno set the fire was not properly admitted as state of mind evidence pursuant to Fed.R.Evid. 803(3). Thus, we reviewed the statements regarding the fire to determine only if these statements were made "in furtherance" of the conspiracy. However, we note that the district court properly instructed the jury that Hospodar's statement was being admitted only to establish his state of mind at the time of the fire in January 1981 that he believed Salerno had set the fire, and not as evidence that any of the defendants had set the fire.

extortion. When assessing a challenge to the sufficiency of the evidence, we must affirm a verdict of guilty if the evidence, when viewed in the light most favorable to the government, establishes that any rational trier of fact could have found the defendant guilty of the crime charged. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

The record reveals that Hospodar testified he initially made extortion payments to Manzella. Manzella subsequently introduced Hospodar to Salerno and told Hospodar to continue making the payments to Salerno. Salerno called Hospodar to accelerate the payment dates, but Hospodar resisted these efforts. Hospodar subsequently met with Salerno, Manzella and two other conspirators and Salerno told Hospodar that "you don't talk to me on the phone the way you did. I want you to know I am the enforcer around here." One month later Hospodar's office at his car lot burned down and Manzella, a co-conspirator, subsequently stated that he "expected it," referring to the fire. Further, Hospodar testified that he paid over $25,000 over a period of four years to the extortioners in order to "stay in business and to stay alive." Tr. at 1209. Thus, the requisite fear to induce payment was established at trial to support a charge of extortion. Further, more than sufficient evidence was introduced to enable the jury to find that the extortion payments depleted the assets of Hospodar's businesses (used car lot and bookmaking operation) and that as a result of these extortion payments interstate commerce was affected. *See United States v. Boulahanis,* 677 F.2d 586, 590 (7th Cir.), *cert. denied,* 457 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982). Hospodar testified that in his bookmaking business he subscribed to a sport's betting line in Las Vegas and that he also owned a used car lot and purchased cars from dealers and auctions located outside of Illinois. He fur-

ther testified that he commingled the funds from these businesses and used the funds from these businesses to pay the street tax or extortion payments, thus depleting the business funds available for these pursuits. Thus, we hold that the evidence was more than sufficient to establish that Salerno violated 18 U.S.C. § 1951 when he extorted money from Hospodar.

As a final note, Salerno alleges in his brief in a summary fashion that Hospodar was incompetent to testify and thus his testimony should have been stricken from the record. The basis for this assertion is his attorney's reference at trial to a January 1984 report from a psychiatrist that Hospodar allegedly had a memory impairment problem. The district court found that Hospodar was competent to testify.[13] The defendant has neither presented this court with the psychiatrist's report, nor has he presented us with any argument as to how Hospodar's testimony at trial indicated he was incompetent as a witness. As we have previously noted, "when a brief does not ... [recite the facts required to establish a legal claim], the court will not root about in the record in the hope that something will turn up." *Walton v. United Consumers Club, Inc.,* 786 F.2d 303, 315 (7th Cir.1986). The defendant had ample opportunity to cross-examine Hospodar and argue to the jury that he was not a credible witness. Under these circumstances it was for the jury to decide the proper weight to give to Hospodar's testimony.

The convictions of the defendants are AFFIRMED.

---

13. The court read the psychiatrist report before ruling that Hospodar could testify. (Tr. 1576A). The court did not hold a separate competency hearing prior to this ruling; and the record reflects that defense counsel never requested such a hearing. Except for the one brief reference in the record raising the issue of Hospodar's competency, the defendant points to no other place in the transcript where he challenged the competency of Hospodar to testify.