**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Bruce FRASCH, Defendant-Appellant.**

**No. 86–2482.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 18, 1987.

Decided May 6, 1987.

Peter A. Regulski, Onesto, Giglio, Meltreger & Associates, Chicago, Ill., for defendant-appellant.

Mark D. Pollack, Asst. U.S. Atty., Anton Valukas, U.S. Atty., U.S. Attorney's Office, Chicago, Ill., for plaintiff-appellee.

Before CUDAHY, FLAUM, and RIPPLE, Circuit Judges.

FLAUM, Circuit Judge.

Bruce Frasch was convicted on multiple counts of racketeering, extortion, and tax evasion. On appeal, he raises three objections to the manner in which his trial was conducted. First, Frasch argues that the district court abused its discretion in refusing to redact three tape recordings of conversations in which Frasch used the word "nigger." Second, Frasch argues that the government failed to prove the requisite connection between his extortion activities and interstate commerce for purposes of the Hobbs Act, 18 U.S.C. § 1951 (1982). Finally, Frasch objects to the district court's admission into evidence of statements by his co-conspirators, on the ground that there was insufficient independent evidence of a conspiracy for purposes of Federal Rule of Evidence 801(d)(2)(E). We reject each of these claims, and affirm Frasch's conviction.

### I.

In 1981, Bruce Frasch, a sergeant with the Cook County Sheriff's Police, was promoted to the position of commander of its Vice Control Unit. This unit was primarily responsible for the enforcement, in Cook County, of state laws pertaining to gambling, prostitution, and liquor.

On August 28, 1985, as a result of an FBI undercover investigation called "Operation Safebet," a federal grand jury returned a twenty-one count indictment against Frasch and five other officers of the Cook County Sheriff's Police. The indictment charged that between 1977 and 1985 the defendants had solicited and received bribes in their official capacity in order to protect the activities of various bookmakers, gamblers, and houses of prostitution operating in Cook County. Frasch was named as a defendant in fifteen of the counts.

Four of the six police officers named in the indictment pleaded guilty; only Frasch and one co-defendant, James Keating, stood trial. At trial, the government's case rested on three groups of witnesses: operators of unlawful businesses who had assisted the FBI in its investigation; FBI agents who had established direct undercover contact with the suspects; and Vice Control Unit members who had admitted their involvement in the charged scheme. The jury found Frasch and Keating guilty of all

counts brought against them, and Frasch now appeals his conviction.

## II.

### A.

Before the trial, the government provided defense counsel with copies of all tape recordings related to the case, and transcripts of these recorded conversations. On three of these tapes Frasch could be heard making racially derogatory remarks to Tom Gervais, a man who had been active in various prostitution and off-track betting schemes and had agreed to cooperate with the FBI investigation. For example, on November 23, 1981, Gervais and Frasch discussed setting up an off-track betting service for horse racing. In the course of this taped conversation, Frasch remarked:

> See what happens. 'Cause I really think that if niggers hadn't gotten involved in the last time. They just ripped everybody off, you know, might not have a problem.

On January 13, 1982, Gervais and Frasch had a similar conversation. According to the transcript, Frasch remarked, "Yeah, who plays the ... harness, it sucks, it's just a nigger game, you know, for the most part." In the course of this conversation, Frasch also advised Gervais to be careful with "trick bets" (bets with long odds and big payoffs):

> That's what happened last time, see, when the niggers got involved. They, "fuck you, we ain't paying you. We didn't get to the track today."

Finally, in a conversation on January 15, 1982, Frasch gave Gervais further advice about setting up an off-track betting service, and made a number of similar derogatory racial remarks.

After listening to these tapes, defense counsel filed a motion based on Rule 403 of the Federal Rules of Evidence [1] to redact portions of the tape recordings and transcripts of these conversations. The motion requested that the isolated words "nigger" and "shine" be expunged or, in the alternative, that the sentences containing racial remarks be excluded as irrelevant. The district court denied the motion, stating that "[c]ounsel may tender an appropriate limiting instruction." [2]

The jury was selected on May 5, 1986, from a venire panel that included several black members. During the voir dire, the attorney for Frasch's co-defendant asked the venire panel whether anyone would feel so offended by "racially derogatory remarks" made by the defendants that they would not be able to give the defendants a fair trial. He did not speak more specifically than this, and there was no response from the panel. The judge did not question the venire panel.

The jury that was finally selected was composed of nine black jurors, two white jurors, and one Hispanic juror. After the jury selection, the defense renewed its motion to redact, and the court again denied the motion. The judge stated that he had reviewed the transcripts and found redaction unnecessary in light of the voir dire questioning and the proposed limiting instruction. Moreover, the judge remarked that he had recently presided over an employment discrimination trial with three black jurors, and that the defendant had won even though similar racial remarks had been attributed to him. Frasch now challenges the court's denial of his motion to redact as an abuse of discretion under Rule 403.

■■■ When a trial court has balanced the probative value of a piece of evidence against the danger of unfair prejudice, the task of the reviewing court is not to sec-

---

**1.** Federal Rule of Evidence 403 states:
   Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**2.** This limiting instruction, which was read to the jury as each of the three tapes was played, admonished the jurors to disregard the racially offensive language and not to permit this language to affect their determination of whether the government had proved its case beyond a reasonable doubt.

ond-guess the decision, but only to ensure that the trial court made a principled exercise of its discretion. *See United States v. Beasley*, 809 F.2d 1273, 1279 (7th Cir.1987). In this case, the judge denied the motion to redact because he believed that, in light of his experience, the questioning of the venire panel and a subsequent limiting instruction would be sufficient to prevent unfair jury prejudice. Although we recognize that the effect of a limiting instruction may often have little impact on a jury's collective thought processes, on the facts of this case we cannot conclude that, in refusing to redact portions of the tapes, the trial court failed to exercise its discretion, or exercised it in an unprincipled way.

▪ Having said this, we nevertheless offer two suggestions for mitigating the prejudicial potential of highly offensive language in future cases. First, the trial court should carefully consider whether substitution or deletion of the offensive words would damage the probative value of the evidence. In this case, the government argued that Frasch's identification of blacks as a specific group that had previously been in charge of off-track betting parlors was necessary to the jury's understanding of the tape-recorded conversations. However, the offensive word "nigger"—as opposed to the neutral word "black"—had little or no probative value, but a great deal of prejudicial potential. Substitution of the neutral word for the inflammatory word might have further mitigated the prejudicial potential of Frasch's remarks without disturbing their evidentiary value.[3]

Second, when the offensive language has significant probative value, or when deletion or substitution would be impracticable, the trial court should question the venire panel, using the actual language that the jury will later hear. Directly confronting the panel with the offensive language may well decrease the risk of unfair prejudice at trial. Moreover, the judge is in a better position to confront the panel with such language than is counsel, because counsel may speak hesitantly for fear of incurring the animosity of the panel. In this case, Frasch argues that counsel spoke tentatively out of just such a reluctance to offend. As a result, the abstract phrase "racially derogatory language" that counsel used in his questioning may not have effectively prepared the panel for the words the jury ultimately heard.

### B.

Frasch next argues that his conviction on the Hobbs Act counts, *see* 18 U.S.C. § 1951 (1982), must be reversed because the government failed to prove a sufficient link between his extortion activities and interstate commerce. We reject this contention.

▪ The Hobbs Act applies to extortionate conduct that "in any way or degree obstructs, delays, or affects [interstate commerce] or the movement of any article or commodity in [interstate commerce]." 18 U.S.C. § 1951(a) (1982). We have interpreted this language to mean that the Hobbs Act extends to the limits of the Commerce Clause. *See United States v. Anderson*, 809 F.2d 1281, 1286 (7th Cir. 1987); *see also Stirone v. United States*, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960). Even a *"de minimis* effect [on interstate commerce] is enough provided it is not speculative or attenuated." *United States v. Conn*, 769 F.2d 420, 424 (7th Cir.1985) (*citing United States v. Mattson*, 671 F.2d 1020, 1024 (7th Cir. 1982)).

▪ For the purpose of its undercover investigation, the FBI operated an off-track betting service called the Palatine Sporting Fans Club ("PSFC"). Tom Gervais posed as the PSFC's owner, and Frasch arranged for protection payments from Gervais in return for helping the PSFC avoid the police. At trial, Frasch and the government

---

3. In other situations, however, the inflammatory character of the language used may itself have significant probative value. *See, e.g., Hunter v. Allis-Chalmers Corp.*, 797 F.2d 1417, 1423 (7th Cir.1986) (Evidence that a defendant called black people "niggers" was direct evidence of what his racial attitudes were, and thus probative in an employment discrimination case.).

stipulated that numerous items bought for and used in the operation of the PSFC, including furniture, paper and printing supplies, food, and natural gas, had moved in interstate commerce prior to their purchase by the PSFC.

These facts are sufficient to establish that Frasch's extortion had an effect on interstate commerce. The PSFC was a purchaser of goods in interstate commerce, and the money it paid in bribes could have been used for more such purchases. *See United States v. O'Malley,* 796 F.2d 891, 898 (7th Cir.1986); *Mattson,* 671 F.2d at 1024. The fact that the PSFC was completely controlled by the government makes no difference. *See Conn,* 769 F.2d at 424 (Purchases by a law firm, created and operated by the FBI, that serviced only government agents but was subject to extortion constituted a sufficient connection with interstate commerce.).[4] It is also irrelevant that the PSFC was itself an illegal organization. *See United States v. Esposito,* 771 F.2d 283, 286 (7th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1187, 89 L.Ed.2d 302 (1986); *United States v. Ambrose,* 740 F.2d 505, 511–12 (7th Cir.1984), *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985).

### C.

Finally, Frasch objects to the district court's admission of out-of-court statements made by his alleged co-conspirators as inadmissible under Federal Rule of Evidence 801(d)(2)(E).[5] We have stated that, under this rule:

> The Government must prove, by evidence independent of the challenged statement, that a conspiracy existed. Also it must prove that both the hearsay declarant and the defendant against whom the statement is offered are members of the conspiracy. Finally, the government must establish that the statement was made during the course of and in furtherance of the conspiracy.

*United States v. Gironda,* 758 F.2d 1201, 1217 (7th Cir.), *cert. denied sub nom. Spiess v. United States,* —— U.S. ——, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985). Frasch argues that there was insufficient independent evidence of a conspiracy.

In this case, the government submitted a proffer of its anticipated proof, and the district court conditionally admitted the co-conspirator statements based on this proffer. This procedure was in accordance with *United States v. Andrus,* 775 F.2d 825, 836–37 (7th Cir.1985). At the close of the government's case, the district court denied Frasch's motion for a mistrial, finding sufficient independent evidence to establish Frasch's participation in the conspiracy, and thus to justify the admission of the co-conspirator statements. We review such findings under the "clearly erroneous" standard, *see O'Malley,* 796 F.2d at 901, and in this case we find no error in the district court's decision.

---

**4.** *United States v. Brantley,* 777 F.2d 159 (4th Cir.1985), *cert. denied,* —— U.S. ——, 107 S.Ct. 90, 93 L.Ed.2d 42 (1986), on which Frasch relies, is distinguishable. In *Brantley,* the Fourth Circuit held that the jurisdictional predicate of the Hobbs Act was not satisfied where the FBI created a mock gambling parlor that was used solely by FBI undercover agents, and purchased whiskey for use at the parlor which had previously moved in interstate commerce. The *Brantley* court found that the whiskey alone could not support federal jurisdiction because it was unnecessary to the operation of the business. 777 F.2d at 162. We have previously questioned the reasoning in *Brantley. See United States v. Podolsky,* 798 F.2d 177, 180 (7th Cir.1986). In any event, the *Brantley* court carefully distinguished a previous case, *United States v. Santoni,* 585 F.2d 667 (4th Cir.1978), *cert. denied,* 440 U.S. 910, 99 S.Ct. 1221, 59 L.Ed.2d 459 (1979). In *Santoni,* a cleaning corporation set up by the FBI purchased cleaning supplies that were necessary to fulfill its obligations under a contract to clean a public building. The purchase of these supplies provided the requisite connection to interstate commerce. This case is closer to *Santoni* than *Brantley,* because the items purchased by the PSFC were necessary to its operation.

**5.** Federal Rule of Evidence 801(d)(2)(E) provides:

> **(d) Statements Which Are not Hearsay.** A statement is not hearsay if—
>
> **(2) Admission by Party-Opponent.** The statement is offered against a party and is ...
>
> **(E)** a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

## III.

The district court did not abuse its discretion in refusing to redact portions of tape-recorded conversations that contained racially derogatory language, in light of the steps it took to mitigate the prejudicial potential of the conversations. Moreover, the government proved a sufficient connection between Frasch's extortion activities and interstate commerce for purposes of the Hobbs Act. Finally, there was sufficient independent evidence of Frasch's participation in the charged conspiracy to permit admission of statements by his co-conspirators. Bruce Frasch's conviction is, therefore, AFFIRMED.