**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Thomas Edward HARTY, Walter Lesczynski, Paul DiCaro, Michael Gurgone, Defendants–Appellants.**

**Nos. 89–2641, 89–2642, 89–2671, 89–2672.**

United States Court of Appeals, Seventh Circuit.

Argued May 10, 1990.

Decided April 26, 1991.

Stephen D. Anderson, Dept. of Justice, Chicago Strike Force, Chicago, Ill., for plaintiff-appellee.

William Hedrick, Skokie, Ill., Marvin Bloom, Miriam F. Miquelon, Debra R. Bernard, Keck, Mahin & Cate, Philip Krasny, Schlesinger & Krasny, Chicago, Ill., for defendants-appellants.

Before COFFEY and KANNE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

COFFEY, Circuit Judge.

Thomas Harty, Walter Lesczynski, Paul DiCaro and Michael Gurgone were convicted by a jury for participating in a conspiracy to commit robbery and attempted robbery in violation of the Hobbs Act, 18 U.S.C. § 1951,[1] and the use of a firearm during the commission of a felony in violation of 18 U.S.C. § 924(c)(1) and 18 U.S.C. § 2;[2] they appeal. Michael Gurgone also appeals his seven-year sentence as being excessive and disproportionate to the other defendants. We affirm.

## I. BACKGROUND

On November 28, 1983, eight men attempted to burglarize the vault at Balmoral Park Race Track, a horseracing facility in Crete, Illinois.[3] The attempt was foiled

---

1. "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than 20 years, or both."

2. "(c) Whoever—(1) uses a firearm to commit any felony for which he may be prosecuted in a court of the United States ... shall, in addition to the punishment provided for the commission of such felony, be sentenced to a term of imprisonment for not less than one year nor more than ten years."
18 U.S.C. § 924(c)(1). 18 U.S.C. § 2(a) provides, "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

3. The funds included a $500,000 bank roll always retained at the track by the Balmoral Racing Club, Inc. for parimutuel betting, $81,-126.20 in profits that belonged to Cloverleaf Racing Club, a club that had just ended its lease of the race track the day before the robbery attempt, and $53,514.80 of Balmoral's federal and state withholding taxes.

when two security guards made a routine but unexpected inspection of the premises. The would-be robbers restrained the guards, but after learning that the guards were required to check in every 15 minutes, the robbers abandoned their quest and released the guards, since the unexpected security check deprived them of the five hours of uninterrupted time they anticipated they would have to crack the safe.

In the investigation of the attempted armed robbery, the government discovered that one Paul Panczko was involved in the conspiracy to commit armed robbery.[4] The government persuaded Panczko to assist the FBI investigation of the Balmoral armed robbery attempt to cut down on his jail time exposure.[5] Further, he was directed to wear a "wire" while engaging his co-conspirators in conversations. After acquiring the evidence against James Basile over Panczko's "wire," the government confronted Basile with the evidence, and he decided to enter into a plea agreement.[6] Prior to signing the plea agreement, Basile received a letter from the United States Department of Justice stating that they would request that the court grant Basile immunity from prosecution for any evidence that may be developed during the trial regarding his participation in any other organized crime activity. Upon the completion of their investigation, including the

information received from the informants, Panczko and Basile, as well as the tape-recorded conversations between Panczko and the defendants, the government obtained criminal indictments against the other six alleged participants in the attempted armed robbery. The jury returned a verdict convicting the four appellants of conspiracy to commit armed robbery and attempted armed robbery.[7]

## II. DEFENDANTS' APPEAL OF JURISDICTION AND THE ADMISSIBILITY OF EVIDENCE

The appellants challenge the district court's jurisdiction under 18 U.S.C. § 1951, alleging that the conspiracy to commit armed robbery and the attempted armed robbery did not involve interstate commerce; thus the crime is not under the Hobbs Act. They also assert that the admission of the taped co-defendant conversations violates Federal Rule of Evidence 804(b)(3) and the Confrontation Clause of the Sixth Amendment, as the tapes allegedly lack adequate indicia of reliability.

### A. Jurisdiction over the Hobbs Act Charges

 For federal jurisdiction to exist over a Hobbs Act violation, the government must demonstrate that there is a nexus between interstate commerce and the al-

---

4. According to the government allegations, eight men were involved in the conspiracy to commit armed robbery and the armed robbery attempt. In addition to the four appellants, Paul Panczko, James Basile, Gerald Ciancio, and David Sheehan purportedly participated in the attempted robbery. Panczko and Basile aided the government's investigation of the attempted robbery in exchange for government recommendations of reduced sentences. Gerald Ciancio, the man who admittedly bypassed the Balmoral burglar alarm, testified for the government under use immunity. He claimed that he first learned of the plan to rob Balmoral the evening of the attempt when DiCaro requested that they meet for an urgent discussion. When DiCaro asked him to bypass the alarm, he refused. DiCaro thereupon threatened him with a gun, and he agreed to bypass the alarm, purportedly because he feared for his life. All charges against Ciancio were dismissed on motion of the United States. Co-defendant David Sheehan was acquitted of all charges.

5. At his sentencing hearing for an unrelated crime, Panczko was classified as a dangerous special offender because of his involvement in the attempted Balmoral robbery and other alleged robberies. The court increased his maximum anticipated 2 year sentence to a 10 year period of confinement as a result of his dangerous special offender status.

6. The plea agreement provided that Basile would plead guilty to the Balmoral Racetrack burglary and armed robbery attempt and testify in any of these cases in which he might be called as a witness; further, the government agreed to drop two unrelated firearms charges and to recommend that he receive a maximum sentence of 15 years rather than a possible 50 years' sentence.

7. As noted in note 4, *supra,* Gerald Ciancio testified for the government under a grant of immunity from the court, and David Sheehan was acquitted of all charges.

leged conspiracy to commit the armed robbery and the attempted armed robbery. The requisite nexus may be established through a slight impact on commerce: "an effect on interstate commerce will be shown even if the actual impact on commerce is *de minimis*, or, in the absence of proof of actual impact, if there is a realistic probability that the [robbery] will have some effect on interstate commerce." *United States v. Glynn*, 627 F.2d 39, 41 (7th Cir.1980) (citation omitted); *see also, e.g., United States v. Hocking*, 860 F.2d 769, 777 (7th Cir.1988); *United States v. Anderson*, 809 F.2d 1281, 1286 (7th Cir. 1987); *United States v. Tuchow*, 768 F.2d 855, 870 (7th Cir.1985). This court has previously found a nexus with interstate commerce under a "depletion of assets" theory. Under the "depletion of assets" theory, "commerce is affected when an enterprise, which either is actively engaged in interstate commerce or customarily purchases items in interstate commerce, has its assets depleted through [robbery], thereby curtailing the victim's potential as a purchaser of such goods." *United States v. Blakey*, 607 F.2d 779, 784 (7th Cir.1979) (quoting *United States v. Elders*, 569 F.2d 1020, 1025 (7th Cir.1978)); *see also United States v. O'Malley*, 796 F.2d 891, 902 (7th Cir.1986).

The government argues that the required nexus between interstate commerce and the alleged conspiracy to commit armed robbery and attempted armed robbery is established through the aforementioned depletion of assets theory. In *United States v. Blakey*, we held "that the removal of $1,000 from [the victim's] pocket could curtail his purchases ... in interstate commerce ... [and] that [extorted] payments much smaller than $1,000 have at least a *de minimis* impact on interstate commerce." 607 F.2d at 784 (citations omitted). Thus, the government argues that if the extor-

tion of less than $1,000 can impact interstate commerce, certainly an attempted theft of over $500,000 will provide the requisite nexus.

■ Conversely, the appellants contend that the government failed to demonstrate that the conspiracy to commit armed robbery and attempted armed robbery had a nexus with interstate commerce. They concede that the business of operating Balmoral Racing Club, Inc. has an impact on interstate commerce, but they assert that the monies in Balmoral's vault on the night of the armed robbery attempt was not the property of Balmoral because from October 2, 1983, to November 27, 1983, the day before the robbery attempt, Balmoral Racing Club, Inc. leased the racetrack and the $500,000 bank roll to Cloverleaf Racing Club, Inc.[8] The appellants argue that "[i]n the absence of testimony that the license agreement expired prior to the next day of racing (which according to the general manager would have been November 30, 1983), it is reasonable to conclude that Cloverleaf was still the lessee or owner of the funds in the vault...." Thus, according to the appellants' theory, the theft of the money would have impacted Cloverleaf rather than Balmoral, and the government presented no evidence that Cloverleaf's business activities were of such a nature that they qualified to establish the required nexus within the limits of the Hobbs Act. Although challenges to subject matter jurisdiction may be raised at any time, *cf.* Fed.R.Civ.P. 12(h)(3), the appellants' argument regarding the ownership of the money is a factual challenge not raised before the district court. "[T]his court has repeatedly stated that arguments raised for the first time on appeal are waived." *Colon v. Schneider*, 899 F.2d 660 (7th Cir. 1990). Since the defendants failed to raise this argument before the district court,

---

**8.** Cloverleaf is a business enterprise that sometimes conducts races at Balmoral Racetrack (Balmoral Racing Club, Inc. operates the racetrack most of the time). When Cloverleaf leased the racetrack, it acquired the right to use the bank roll as well. The $500,000 bank roll was kept at the racetrack for the purpose of operating parimutuel betting. Although Clover-

leaf had the right to use the bank roll for parimutuel betting, the Balmoral general manager testified that the money at all times belonged to Balmoral. No evidence was presented to imply that Cloverleaf had any legal rights in the bank roll or that it would have been liable for the loss if the robbery had been successful.

which would have given the government a reason to establish the precise ownership of the money in the vault, we refuse to consider the argument at this late date.

■ Moreover, the appellants' jurisdictional challenge must fail regardless of who owned the money, for when Cloverleaf leased the racetrack from Balmoral, Cloverleaf's operation of the track impacted interstate commerce the same as if Balmoral were conducting the races. Approximately twenty-five percent of the horses and owners came from states other than Illinois, and many of the customers traveled to Illinois from the states of Michigan, Ohio, Indiana and Wisconsin. Furthermore, some of the racetrack's essential services (e.g., parimutuel betting machines and advertising) as well as some of the necessary supplies were delivered from out-of-state firms, and the use of telephones to obtain those services and supplies also involved interstate commerce. Balmoral's general manager testified (and the appellants do not deny) that the presence of the $500,000 bank roll, which Balmoral provided for parimutuel betting, was an integral part of the operation of the racetrack regardless of who operated it. Given these circumstances, had this attempted armed robbery been successful, it would obviously have impacted on interstate commerce because without the bank roll the racetrack would have been unable to operate (change money and accept wagers), thus curtailing its very operation regardless of the technical ownership and control of the property (money) in the vault. The district court's exercise of jurisdiction over the Hobbs Act charges was appropriate.

### B. Admissibility of the Harty Tapes

■ As pointed out earlier, during the course of the government investigation, informant Panczko engaged and recorded the conversations of Harty, DiCaro and Gurgone regarding the attempted armed robbery. The defendants objected to the admission of this evidence, in particular the tapes of the conversations between Panczko and Harty. The petitioners contend that the receipt of these tapes in evidence violated Rule 804(b)(3) (because they lacked the requisite indicia of reliability) as well as their Sixth Amendment right to confront and cross-examine their accuser.[9]

Rule 804(a) and (b)(3) provide for the admissibility of hearsay evidence when (1) the declarant is unavailable, and (2) the statement "at the time of its making ... so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." "[T]he assumption that persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true" provides the requisite "circumstantial guarantee of reliability" to make the hearsay statements admissible. Notes of Advisory Committee on Proposed Rules, Rule 804(b)(3). Rule 804(b)(3) adds a third requirement when the statement tends to incriminate the declarant and *exculpate* the accused: It "is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."[10]

---

**9.** The petitioners consider the "Harty tapes" to be "[t]he only truly damaging tapes" and "the key evidence" in the case. Thus, we will speak of the "Harty tapes" even though our analysis covers the tapes of conversations with DiCaro and Gurgone as well.

Harty's argument dealing with the admission of the tapes is without merit in that Rule 801(d)(2)(A) says that an admission by a party that is "the party's own statement" is not hearsay.

**10.** *See United States v. Silverstein,* 732 F.2d 1338, 1346–47 (7th Cir.1984) (declarant's statement not admissible to exculpate accused be-

cause circumstances failed to indicate trustworthiness of statement). The rationale of this third requirement is that a declarant might very well fabricate the statement for the purpose of exculpating the accused (the evidence in *Silverstein* implied such fabrication: "Evidence that the judge was not required to ignore created a strong inference that Matthews' statements were totally fabricated...." *Silverstein,* 732 F.2d at 1347). The Notes of Advisory Committee on Proposed Rules for Rule 804(b)(3) state that "[t]he requirement of corroboration should be construed in such a manner as to effectuate its purpose of circumventing fabrication." Thus, under Rule 804(b)(3), corroborating circum-

In *United States v. Alvarez*, 584 F.2d 694 (5th Cir.1978), the Fifth Circuit chose to adopt the third requirement of Rule 804(b)(3), the existence of "corroborating circumstances [that] clearly indicate the trustworthiness of the statement," as a prerequisite to the admission of Rule 804(b)(3) evidence inculpating a defendant in order to pass constitutional muster under the Sixth Amendment Confrontation Clause. *Id.* at 700–01. As the *Alvarez* court noted, Congress intentionally avoided codifying constitutional evidentiary principles such as those required under the Sixth Amendment Confrontation Clause when it adopted the Federal Rules of Evidence:

> "[T]he basic approach of the rules is to avoid codifying, or attempting to codify, constitutional evidentiary principles, such as the ... sixth amendment's right of confrontation. Codification of a constitutional principle is unnecessary and, where the principle is under development, often unwise."

*Id.* at 700 (quoting S.Rep. No. 93–1277, 93d Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Admin.News 7051, 7068). Congress properly left the question of the constitutional parameters for determining the admissibility of hearsay evidence to the courts. In *Alvarez*, the Fifth Circuit consolidated the requirements of Rule 804(b)(3) and the Confrontation Clause in dealing with the admission of incriminating, out-of-court statements by an unavailable declarant when offered to inculpate a defendant.

■ We recently adopted the Fifth Circuit's approach to Rule 804(b)(3) in *United States v. Garcia*, 897 F.2d 1413 (7th Cir. 1990), while retaining a separate Confrontation Clause analysis. Under the three-prong 804(b)(3) test we established in *Garcia*, "a court must find that, (1) the declarant's statement was against the penal interest of the declarant, (2) corroborating circumstances exist indicating the trust-

worthiness of the statement, and (3) the declarant must be unavailable." 897 F.2d at 1420. Our Confrontation Clause test has long required "that the declarant actually made the statement ... [and (2) that] there must be circumstantial evidence supporting the truth of the statement." *United ed States v. Blakey*, 607 F.2d 779, 786 (7th Cir.1979). Under the Supreme Court's recent holding in *Idaho v. Wright*, —— U.S. ——, 110 S.Ct. 3139, 3150, 111 L.Ed.2d 638 (1990), however, the second prong of *Blakey* is invalid and the test must now conform to the requirement that the hearsay must be reliable "by virtue of its inherent trustworthiness."

1. Admissibility under Rule 804(b)(3)

■ The appellants do not question whether Harty's statements were against his penal interest, and their contention that Harty was unavailable as a witness only because the government chose to make him a defendant is without merit.[11] Thus, only the second prong of the *Garcia* test requires analysis, that is, the question of whether there are corroborating circumstances demonstrating that the statement is trustworthy.

Initially, the appellants contend that the Harty tapes are inherently unreliable because the conversations recorded on the tapes occurred nearly two years after the armed robbery attempt, thus the passage of time is crucial because much of the conversation on the Harty tapes dealt with the identity of the government informant who was supplying incriminating evidence to the grand jury, and many outsiders had also acquired knowledge about the attempted armed robbery subsequent to the event. Thus, they argue, there was a risk that the trial jury would confuse and possibly misinterpret a person's knowledge *about* the armed robbery attempt, acquired after the fact, for actual participation *in* the at-

stances are required if the evidence is submitted to *exculpate* the accused, but not where, as here, the evidence is submitted to *inculpate* the defendants.

11. The appellants argue that Harty's unavailability was merely a result of the government's

"trial tactics." This argument is frivolous because under the appellants' theory, the government could never use statements that are admissible under Rule 804(b)(3) if it wanted to prosecute the declarant; the only option would be to grant the declarant immunity and force him to testify.

tempt. Secondly, the appellants assert that in his role as a look-out and the driver of a get-away vehicle, Harty was in no position to have first-hand knowledge about the event. Finally, appellants claim that Harty, during the taped conversations, was merely assenting to statements made by Panczko, or, when Harty stated facts, he may have been repeating information he had acquired from Panczko earlier in their conversations. The appellants' arguments overlook the essential nature of Harty's statements, however, which demonstrated his first-hand knowledge of inculpatory facts, as well as the independent corroboration of the incriminating evidence against the co-defendants. Harty made a number of incriminating statements on the tapes that clearly establish his participation in the Balmoral burglary and armed robbery attempt, and, as the tapes demonstrate, the statements were not mere repetitions of, but were in addition to, many of the facts and circumstances Panczko recited during their conversations. As the Advisory Committee noted in regard to Rule 804(b)(3), "[t]he circumstantial guaranty of reliability for declarations against interest is the assumption that persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true." This was not a situation where Harty may have been lying to gain favor with the government or bragging to enhance his reputation before other criminals; rather, he participated in the taped conversations with Panczko out of self-interest—Harty had an interest in learning the information as well as the source of the information presented to the grand jury. Under these circumstances Harty had a strong motivation to recount the events accurately. Additionally, the government witnesses provided independent support for the validity of Harty's statements. Panczko's, Basile's and Ciancio's trial testimony independently corroborated the following information recounted in the Harty tapes that: 1) Harty's co-conspirators DiCaro, Gurgone,

Lesczynski, Basile, Ciancio and Panczko were participants in the Balmoral armed robbery attempt,[12] 2) the participants used radio communications during the attempted armed robbery, 3) Harty drove one vehicle and Gurgone drove the other, 4) some of the burglars entered the racetrack through a tunnel, 5) Ciancio disengaged the alarm, and 6) Gurgone was late for the robbery. The corroboration of this testimony clearly "indicat[es] the trustworthiness of [Harty's] statement[s]"; thus the Harty tapes were admissible under Rule 804(b)(3).

### 2. Confrontation Clause Challenge to Admission of Harty Tapes

■ The appellants argue that the admission of the Harty tapes violated their Sixth Amendment right to confront and cross-examine their accuser, but they fail to address the test adopted by the Seventh Circuit. This Court has previously adopted a two-part test from *Dutton v. Evans*, 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213 (1970), to be addressed in determining whether the admission of the Harty tapes under a hearsay exception violates the defendants' right to confront their accuser. "First, it must be clear that the declarant actually made the statement in question. Second, there must be circumstantial evidence supporting the truth of the statement." *United States v. Blakey*, 607 F.2d at 786. In view of *Idaho v. Wright*, 110 S.Ct. at 3150, the Supreme Court has mandated a new test for the second prong of our analysis. "To be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial." *Id.* Thus under our new test, it must be clear that Harty made the statements, and the statements must be inherently reliable because of the circumstances surrounding them. The appellants do not challenge the fact that Har-

---

**12.** The appellants contend that "Harty states in these tapes that he had never met the other 'crew'" (purportedly DiCaro, Gurgone, and Sheehan). The appellants' assertion is misleading because, in fact, Harty said that some of the

"other crew" (it is unclear to whom he was referring) had never met him, but a few minutes later Harty stated that DiCaro and Gurgone had been in his home for the planning session prior to the robbery attempt.

ty is the person who actually made the statements on the tapes in question; thus the remaining issue is whether the circumstances surrounding the making of the tapes caused them to be inherently reliable. As we stated above, Harty participated in the taped conversations with Panczko out of self-interest. He intended to continue concealing his participation in the conspiracy to rob the Balmoral racetrack, and he was interested in knowing what information the government possessed as well as the source of the information. Furthermore, Harty's statements were sufficiently incriminating that he would have been unlikely to make them if he did not believe them to be true. Thus, the circumstances surrounding the making of the Harty tapes demonstrated that the statements possess the requisite "indicia of reliability by virtue of [their] inherent trustworthiness." *Idaho v. Wright*, 110 S.Ct. at 3150.[13]

The appellants argue that our decision in *Riner v. Owens*, 764 F.2d 1253 (7th Cir. 1985), bars the admission of the Harty tapes. In *Riner* we reversed a conviction that was based on an out-of-court statement by a co-defendant. The inadmissible statement in *Riner* is clearly distinguishable from the Harty tapes, however, because it "was the only evidence clearly implicating [the defendant] as an aider and abettor of his uncle." *Id.* at 1260. Consequently, there was an inadequate demonstration of reliability of the statement. In contrast, the information contained in the Harty tapes was inherently trustworthy because of the circumstances (Harty's attempt to protect himself) surrounding the making of the statements. Moreover, the evidence contained in the tapes was corroborated in the trial testimony of Basile, Ciancio and Panczko, who participated in the taped conversations, as well as through the physical evidence of burglary from the scene of the crime (bypassed alarm) and the testimony of the security guard regarding the theft of her radio. Thus the appellants' reliance on *Riner* is misplaced.

## III. GURGONE'S CHALLENGE TO THE SUFFICIENCY OF THE EVIDENCE OF THE LENGTH OF HIS SENTENCE

Michael Gurgone challenges the sufficiency of the evidence for his conviction and further alleges that his seven-year sentence is excessive and disproportionate to the sentences of the other defendants and is thus in violation of the Eighth Amendment.

### A. Sufficiency of Evidence

"When assessing a challenge to the sufficiency of the evidence, we must affirm a verdict of guilty if the evidence, when viewed in the light most favorable to the government, establishes that any rational trier of fact could have found the defendant guilty of the crime charged." *United States v. O'Malley*, 796 F.2d 891, 902 (7th Cir.1986) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Gurgone essentially argues that the Harty tapes were inadmissible

---

**13.** The appellants make a feeble and unconvincing effort to construct a new doctrine for hearsay admissibility from miscellaneous statements in prior cases that would require that hearsay statements be made in a formal setting, such as at a preliminary hearing or before a grand jury, in order to have the requisite indicia of reliability. This Court has never even intimated a requirement of this nature and refuses to accept this self-serving invitation. The cases cited for the proposition, *United States ex rel. Haywood v. Wolff*, 658 F.2d 455, 463 (7th Cir.1981) and *United States v. Guinan*, 836 F.2d 350, 355 n. 12 (7th Cir.1988), are inapposite because those cases merely noted that the formal setting provided the requisite indicia of reliability to satisfy the Confrontation Clause, not that a formal setting was required.

The petitioners make a further spurious argument in contending that *Douglas v. Alabama*, 380 U.S. 415, 420, 85 S.Ct. 1074, 1077, 13 L.Ed.2d 934 (1965) and *United States v. Key*, 725 F.2d 1123, 1126–27 (7th Cir.1984), co-defendant confession cases, require exclusion of hearsay evidence that adds "critical weight" to the government's case. The "critical weight" argument, if accepted, would completely emasculate our statement-against-penal-interest doctrine, and it is without basis in law. The statements in the cases the appellants cite lacked the requisite indicia of reliability, and the courts were required to determine whether the admission of the unreliable evidence so prejudiced the defendants that the verdict must be vacated. There is no question that the Harty tapes possess the requisite indicia of reliability.

hearsay (a claim rejected) and that the government witnesses were incredible, since they were testifying under plea bargains or grants of immunity as well as because of inconsistencies in their testimony.[14] There were inconsistencies in the witnesses' testimony, and this is not unusual. For example, Basile at one point testified that the burglary and attempted armed robbery was moved back one day from Sunday night to Monday night because Gurgone told him that an accomplice wanted the time changed for an unknown reason. But the day before, Basile testified that the time of the planned robbery was moved back in time as a result of a change in the Brinks money delivery schedule. Gurgone also insists that Panczko contradicted himself when he testified at trial that he helped tie the security guards with tape, for he denied it on the Harty tapes.

▉▉▉▉ Despite Gurgone's examples of minor inconsistencies in the testimony, we refuse to reassess the credibility of the witnesses' testimony because that is the prerogative of the trial court.[15] "An appellate court will not weigh the evidence or assess the credibility of the witnesses." *United States v. Ramirez,* 796 F.2d 212, 214 (7th Cir.1986). Furthermore, inconsistencies in testimony of this nature are inadequate to make it incredible. This court has recently held that even

> "[w]hen a conviction rests solely upon the uncorroborated testimony of an accomplice, we will uphold the verdict unless the accomplice's testimony is incredible as a matter of law.... To be incredible as a matter of law, a witness' testimony must be unbelievable on its face. In other words, it must have been either physically impossible for the witness to

observe that which he or she claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all. *United States v. Garner,* 581 F.2d 481, 485 (5th Cir.1978). Mere inconsistencies in the witness' testimony do not render it legally incredible. *Id."* *United States v. Dunigan,* 884 F.2d 1010, 1013 (7th Cir.1989). The minor inconsistencies referred to in the testimony of Panczko and Basile cited by Gurgone fail to meet the standard required of evidence that is "incredible as a matter of law." It was for the trier of the facts, the jury, to determine whether the inconsistencies rose to the level of incredible testimony, and obviously they found the testimony to be sufficiently credible to render a verdict of guilty. Upon review, we see no reason to disturb the jury's findings.

### B. Excessive and Disproportionate Sentence

The jury found the defendant Gurgone guilty of conspiracy to commit robbery in violation of 18 U.S.C. § 1951, attempted robbery in violation of 18 U.S.C. § 1951, and the use of a firearm during the commission of an attempted robbery in violation of 18 U.S.C. § 924(c)(1).[16] 18 U.S.C. § 1951 prescribes a maximum sentence of up to a $10,000 fine and 20 years' imprisonment for each violation, and 18 U.S.C. § 924(c)(1) prescribes a maximum sentence of up to ten years. Thus, Gurgone was facing a possible fine of $20,000 and possible imprisonment of 50 years. The trial judge sentenced Gurgone to seven years' imprisonment to be followed by a five-year term of probation.

▉▉▉ For crimes that occurred before the Sentencing Guidelines became effective, it is well settled that "a trial judge in

**14.** Gurgone asserts that the government conceded the witnesses' unreliability in closing argument, but the government did not. The language Gurgone quotes falls short of being a concession. The government merely argued that there was adequate evidence to convict the defendants even without the testimony of the government witnesses.

**15.** Gurgone further argues that his alibi, to which five members of his family testified con-

cerning his presence at a birthday party in his home at the time of the burglary and armed robbery attempt, demonstrates that the government's evidence was unreliable. The jury obviously rejected the alibi, and we refuse to hold that the jury misjudged the evidence.

**16.** Under 18 U.S.C. § 2, Gurgone is a principal in the violation of 18 U.S.C. § 924(c)(1) even though he himself did not carry a firearm.

the federal system generally has wide discretion in determining what sentence to impose." *United States v. Tucker,* 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). For such crimes, " '[a] sentence which is within the limits established by the statute under which it is imposed will not be vacated upon review unless the sentencing judge relied upon improper considerations or unreliable information in exercising his discretion or failed to exercise any discretion at all in imposing the sentence.' " *United States v. Briscoe,* 896 F.2d 1476, 1519 (7th Cir.1990) (quoting *United States v. Harris,* 761 F.2d 394, 402–03 (7th Cir.1985)). Gurgone received a seven-year term of confinement out of a possible 50 years. Nonetheless, arguing that the trial judge improperly considered his arrest record as well as hearsay evidence about other criminal activities at the sentencing hearing, Gurgone contends that the sentence is excessive.

■■■ Gurgone's presentence report reflected that he had a number of arrests for burglary, one conviction for attempted rape and one citation for civil contempt. Without citing legal support, Gurgone asserts that his arrest record was "improper matter" for the trial judge to consider in determining his sentence. Nonetheless, "it is well within a trial court's discretion to rely upon presentence reports which contain references to *any* prior criminal record which establishes a propensity toward crime on the part of the defendant...." *United States v. Madison,* 689 F.2d 1300, 1312 (7th Cir.1982) (emphasis original). Furthermore,

> "the federal rules allow a court to consider the defendant's entire criminal pattern of behavior when determining the defendant's character and propensity toward crime.... In light of the judge's duty to protect society and to impose a fair and just sentence upon the defendant it is only reasonable to allow the judge *wide latitude in the type of information he can consider when sentencing.* Moreover, our review of the federal rules and relevant case law reveals that *a trial court may also consider dismissed charges as evidence of character* when

determining the length of the defendant's sentence....

"Rule 32 of the Federal Rules of Criminal Procedure provides:

> '(c) Presentence Investigation.
>
> (2) Report. The report of the presentence investigation shall contain any prior criminal record of the defendant and such information about his characteristics ... as may be helpful in imposing sentence or in granting probation ... and such other information as may be required by the court.'

Fed.R.Crim.P. 32(c).

"In broadly construing this rule, the Supreme Court has held that the presentence report should contain any information which would be helpful in imposing sentence. 'Highly relevant—if not essential—to [the trial judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.' *Williams v. New York,* 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949)."

*Id.* at 1313 (emphasis added). Gurgone's arrest record was within the "wide latitude ... of information [the judge] can consider when sentencing," especially considering the number of prior arrests dealing with burglary (eight) and theft or robbery (two others).

> "While all judges have the obligation to protect individual rights the judge must not lose sight of the common good of all mankind. In order to render justice to all the judge must be able to impress upon a defendant through the expansive contents of an all encompassing presentence report that we are a country of laws and not men. The criminal must learn that with every cherished right he enjoys he also assumes a corresponding obligation to live according to the law of the land. Our laws are for the protection of all mankind and not just the criminal. Thus, if the defendant has displayed a propensity toward criminal activity over a period of years and has not learned from his past mistakes and

transgressions of the law it is important the judge take these matters into consideration...."

*Id.* at 1314–15. In view of the length of Gurgone's arrest record, it seems rather obvious that he has failed to "learn[ ] from his past mistakes and transgressions of the law."

 The hearsay that Gurgone challenges consisted of a statement by an FBI agent at Gurgone's detention hearing reciting information received from five informants detailing Gurgone's involvement in several burglaries and robberies. Gurgone argues that the FBI's informants were unreliable because two of them told inconsistent stories, depending upon who spoke with them.[17] He fails to undermine the credibility of the other three informants, however. When sentencing a defendant, "a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972) (citations omitted). This Court has previously held that a judge may consider hearsay evidence as part of that inquiry as long as the defendant has an opportunity to respond to it. *United States v. Mealy*, 851 F.2d 890, 907 (7th Cir.1988). At the sentencing hearing, Gurgone attacked the reliability of the hearsay evidence (he succeeded in undermining the reliability of two of the FBI's five informants) and attempted to persuade the judge that he was not involved in criminal activities (still denying involvement in the Balmoral criminal activities). Based upon the case law recited above, and in view of the fact that Gurgone did challenge the hearsay evidence, but failed to discredit the same, it was proper

for the judge to consider the hearsay evidence when imposing the sentence.

After consideration of the facts surrounding the history of Gurgone's criminal activity, the trial judge concluded that Gurgone was not a first-time offender who carelessly got involved with the attempted armed robbery on the spur of the moment. Rather, after reviewing Gurgone's arrest record, prior criminal conviction of attempted rape, incarceration for civil contempt[18] and the testimony of the FBI regarding his involvement in a number of other criminal activities, the sentencing judge was persuaded that Gurgone had a history of criminal activity, much of it involving burglary. The judge made it clear that he was not sentencing Gurgone for any other crime, but that he was exercising his discretion when he imposed a longer period of confinement than he would have given to a first-time offender. Under the circumstances of this case, we do not consider the trial court's consideration of Gurgone's arrest record and the FBI's hearsay evidence to be inappropriate or Gurgone's sentence to be excessive.

 Gurgone asserts that his sentence of seven years' imprisonment violates the Eighth Amendment prohibition against cruel and unusual punishment because his sentence is disproportionate to that of the other defendants when compared with their respective culpability and past criminal activity. Gurgone received the second-longest sentence of the co-defendants despite his claim that he had a reduced role in the attempted armed robbery of Balmoral racetrack. Gurgone has had one criminal conviction (for attempted rape when he was 19) and one civil contempt citation, as opposed to Lesczynski, DiCaro and Harty who all have a history of criminal convictions. Lesczynski, one of the co-defen-

---

17. The two informants provided the FBI with signed statements regarding Gurgone's involvement in other burglaries. They subsequently gave Gurgone's attorney statements, recorded by a court reporter, to the effect that they had lied to the FBI. When the FBI talked with them again, they signed handwritten statements stating that they lied to Gurgone's attorney.

18. The civil contempt, which resulted in 18 months' incarceration at the Metropolitan Correctional Center in Chicago, was the result of Gurgone's refusal to answer questions regarding his knowledge of a theft with which Paul DiCaro, one of the appellants here, was charged. The presentence report asserts that Gurgone introduced DiCaro and Panczko "who were leaders of separate burglary teams, for the purpose of discussing large scale thefts."

dants convicted of carrying a firearm during the armed robbery attempt, was the only defendant who received a longer sentence. DiCaro, who also carried a firearm during the robbery attempt, received six years. The fourth co-defendant, Harty, received only a three-year sentence. Gurgone asserts that his sentence should be no longer than Harty's because they played equal roles in the armed robbery attempt—they both drove co-conspirators to Balmoral and remained outside the racetrack during the burglary.

We fail to understand how a seven-year sentence out of a maximum of 50 years could possibly constitute cruel and unusual punishment considering Gurgone's sordid record of criminal activity, and an unmeritorious challenge of this nature does nothing but waste the court's valuable time. Indeed, the sole case upon which Gurgone relies for his proportionality argument, *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), is inapplicable to his contention. In *Solem,* the Supreme Court focused on the proportionality of the sentence to the crime rather than on the sentences among co-defendants. Moreover, "the disparity of sentences between co-defendants does not alone prove abuse of discretion...." *United States v. Madison,* 689 F.2d 1300, 1315 (7th Cir.1982). "If the sentencing judge gives 'thoughtful consideration' to the sentence ... this court will not disturb the imposition of disparate sentences on co-defendants." *United States v. Nowicki,* 870 F.2d 405, 409 (7th Cir. 1989). The sentencing judge gave "thoughtful consideration" to how Gurgone's past should affect the sentence and explained that "[a]s a result [of your record of criminal activity], I am permitted by the law to deal with you differently than I could deal with someone else who was convicted of breaking the same law. * * * In trying to fashion the sentence I can't overlook what you did." [19] No "inference of impropriety" arises when the sentencing judge focuses so clearly on the particular defendant's situation to determine the length of the sentence. Thus, Gurgone has failed to demonstrate an abuse of the district court's discretion.

Furthermore, a comparison of the co-defendants' culpability and total duration of incarceration demonstrates that Gurgone's allegation of impropriety lacks merit. Gurgone had far more culpability in the attempted armed robbery than Harty: Gurgone introduced the two leaders of the Balmoral conspiracy to each other, Panczko and DiCaro; [20] he was a party to the initial planning of the Balmoral robbery; he obtained the burglary tools (acetylene torch and burning bar) and brought them to the racetrack; he would have taken them into the racetrack and burned open the vault had the armed robbery attempt not been foiled; he was supposed to monitor frequencies until he was notified by DiCaro to bring the burglary tools into the racetrack; and he drove a get-away vehicle to help some of the co-conspirators escape. Harty merely drove a vehicle and acted as a lookout. In contrast to DiCaro, if Gurgone serves his full sentence without any time off for good behavior, he will be released in seven years. DiCaro's six-year sentence was imposed consecutively to an 18–year term of imprisonment that DiCaro began serving in 1984. The fact that DiCaro was ineligible for parole until at least 1996 was a valid factor for the judge to consider in sentencing DiCaro to six years only. Thus, Gurgone's contention of impropriety in sentencing constitutes a mere allegation of disparity and is without merit considering the history of his criminal activity.

The judgment of the district court is

AFFIRMED.

---

19. The court noted that Gurgone refused to accept responsibility for the armed robbery attempt, but he said, "I do not take that as a negative."

20. Gurgone came in contact with Panczko in the Metropolitan Correctional Center while serving the civil contempt citation. He was serving time for refusing to testify about DiCaro's activities. *See supra* note 18.